## JULIUS J. YOUNG v. MELROSE GRANITE COMPANY.[1]

July 14, 1922.

No. 22,812.

**Injury from too long application at heavy work not within Compensation Act.**

The Workmen's Compensation Act does not cover injuries resulting to the muscles and nerves through a too long continuance at a task that is too heavy for the employe and where there is no sudden or violent event producing at the time injury to the physical structure of the body.

Upon the relation of the Melrose Granite Company the supreme court granted its writ of certiorari directed to the district court for Stearns county and the Honorable John A. Roeser, judge thereof, to review the proceedings in that court under the Workmen's Compensation Act brought by Julius J. Young, as employe, against relator, as employer. Reversed.

*R. W. Brower*, for relator and defendant.

*Paul Ahles*, for respondent and plaintiff.

HOLT, J.

Certiorari to review a judgment awarded plaintiff under the Workmen's Compensation Act.

Plaintiff is a stone cutter, having worked many years in the granite shops at St. Cloud. On August 9, 1920, he worked for defendant, and two hours the next morning. He then quit, and at one o'clock the same day started to work for another firm where he continued until December 18, 1920. In February, 1921, he demanded compensation for injuries. When it was refused the complaint herein was filed, wherein the claim is made that the machine at which he was set to work, on the dates mentioned, was so defective and out of repair that the operation thereof caused injuries to plaintiff's right arm and shoulder.

[1]Reported in 189 N. W. 426.

Plaintiff operated a stone surfacing machine of a type quite common in the granite shops of St. Cloud. It may be roughly described as an upright iron post or mast firmly imbedded in a cement foundation. Extending vertically from the post is a long arm upon which is a moveable contrivance carrying the hammer or tool operated by compressed air to dress the surface of the granite. This arm swings around the post and can be raised or lowered by means of a sprocket wheel held in place by a "dog" so as to keep the hammer about three inches above the surface of the stone to be dressed. The hammer is a bell-shaped instrument in which the cutting tool moves up and down very rapidly and with great force. The hammer is moved by the operator back and forth on the arm, and the arm is swung on the post or mast so as to permit any part of the surface of a stone laid on the banker to be reached and ground down. The operator stands upright and extends the arms out almost straight from the shoulder, moving the arm of the machine with one hand and controlling the hammer with the other.

The findings, mainly a rehearsal of the testimony of plaintiff and his medical expert, which attempt to show how the present condition of plaintiff resulted from the operation of the machine are these: "He (plaintiff) had not done any surfacing work for some time and the muscles that are called into play in this occupation were somewhat soft and unused to even the ordinary strain of such work. When working this machine he found that sometimes, on account of the defective condition of the mast, the machine would work toward him, requiring great effort to keep it away and on such places on the stone as needed treatment and at other times he found that the machine was crawling away from him and then it would require great effort to keep it where he wanted it to operate. As a result he found himself working under a great strain and jar and at the end of the day's work found himself exhausted to such an extent that he complained to the foreman, telling him that he was all in from working on that machine. * * * That night the plaintiff suffered a great deal of pain in his shoulder and back, so much so that he was unable to sleep the greater part of the night. On returning to work the next morning he found that the sprocket wheel

had been repaired to some extent, so that it did not slip as it had before and thereby allow the frame [arm] to fall, but in all other respects the machine worked as heavy as before. At about ten o'clock that day * * * he stopped work and told the foreman, in substance, that he would no longer operate this 'horse killer', meaning the machine, and that 'if he stayed at it, it would kill him.' * * * He continued to experience pains in his shoulder and arm, but in spite of that condition he continued his work, as he had a family to support and was very reluctant to cease remunerative employment. After several weeks he noticed that the pain was no longer as acute as it had been at first, but the shoulder was becoming stiff. * * * He also noticed that his shoulder blade would leave its position in the back and would stand outward when his arm was raised in an upward position." It is also found that the muscles which control the shoulder have become atrophied through degeneration of the nerves supporting them and that "these nerves under the heavy strain required by the work of this machine, as aforesaid, were subjected to excessive traction and became, for all practical purposes, dead."

The foregoing findings embody the only salient facts upon which the finding of the ultimate and determinative fact must rest, to wit: "That plaintiff sustained injuries to his shoulder by accident while in the employ of the defendant, and while engaged in performing the usual and ordinary business of such employer."

On certiorari in compensation cases this court is concluded by the findings except as to the legal question whether there is any evidence in support of the same. State ex rel. Niessen v. District Court of Ramsey County, 142 Minn. 335, 172 N. W. 133. With that principle in mind we have examined the evidentiary findings above set out and the testimony of plaintiff and his medical expert and reach the conclusion that the last and controlling finding above quoted has no support. Plaintiff had for years suffered from a dilated heart which at time compelled him to cease work. There is no apparent connection between his heart trouble and the atrophy of the muscles controlling his shoulder blade. It is only mentioned in explanation of the fact that his subsequent work was with a hand hammer and

only exceptionally with a machine, the vibrations of which seemed to irritate his heart. The medical men are agreed that he is not fit physically to do the strenuous work of a stone cutter, even if his shoulder muscles were normal. That these muscles had not been normal for a long time, the uncontradicted testimony that plaintiff had a peculiar swing in delivering hammer blows would indicate. But leaving out these considerations and all of the strong showing made by defendant contradicting plaintiff's testimony and the theory of his medical expert, we are unable to find evidence of accidental injuries that may come under the Workmen's Compensation Law. Although our legislation, as well as that of other states, may be said to be patterned in a great measure upon the compensation legislation of England, there is a divergence in the different acts as to the injuries sought to be covered. Our act does not seek to cover occupational diseases or gradually inflicted ailments, but confines the injuries to those caused by accident, and defines the term thus: "The word 'accident' as used in the phrases 'personal injuries due to accident' or 'injuries or death caused by accident' in this act shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected or unforeseen event, happening suddenly and violently, with or without human fault and producing at the time, injury to the physical structure of the body." Section 8230h, G. S. 1913.

All machines of this sort, operated by compressed air, vibrate. No sudden or violent strain could come to the muscles in guiding the machine even though it worked hard, for the operator was standing upright, and, in merely pulling and pushing while so standing without being braced against anything, no excessive or violent strain could come upon the muscles. Neither could the sudden dropping of the arm of the machine three inches produce any particular strain or jerk on the muscles of the shoulder to a person so working. If any effect at all could come to the operator of this machine it must be attributed to wearying the muscles from a too long continuance at a heavy work. It could not come at any particular moment of time, but only as the work was continued until the exhaustion became too great for the ordinary recuperative forces. Such was the

theory, and only theory, advanced by plaintiff's medical expert when saying that plaintiff in wielding a hand hammer so long over-developed the muscles of the shoulder and arm, used in striking, at the expense of the muscles holding the shoulder blade in position, so that when he was called upon to pull and push with the machine "these muscle fibers became weaker and weaker until at last traction was put onto the nerves that supply these, also including the trophic nerves and sensory nerves and gradually it died, not suddenly; sometimes that takes weeks and sometimes months, and sometimes years."

It seems clear to us that this theory of the doctor does not bring the case within the compensation act. Nothing happened suddenly or violently to plaintiff or any part of his anatomy. He locates no particular moment in the day and a quarter of his employment when any bodily injury or pain was experienced. Nothing happened to the machine out of the ordinary. The arm of these machines often drops, due to the vibrations and the lifting power of the compressed air releasing the "dog." The compensation act was not designed to cover cases where injuries result from ordinary overwork or too long continued effort without any sudden or violent rupture or collapse of some physical structure or function of the body.

Plaintiff relies on State ex rel. Puhlmann v. District Court of Brown County, 137 Minn. 30, 162 N. W. 878; State ex rel. Rau v. District Court of Ramsey County, 138 Minn. 250, 164 N. W. 916, L. R. A. 1918F, 918; and La Veck v. Parke, Davis & Co. 190 Mich. 604, 157 N. W. 72, L. R. A. 1916D, 1277. In the Puhlmann and La Veck cases there was a rupture of a blood vessel, a sudden and violent happening producing at the time injury to the physical structure of the body. The same may be said of the sunstroke in the Rau case. The unexpected collapse while at work indicated a sudden and violent injury to the body. We are mindful of the legislative design to compensate those accidentally injured in the operation of our industries, but we also see in the care with which such injuries are defined an intention not to cover ailments of gradual development which ingenious medical experts may by uncertain theories trace back over months and years as due to overwork or too

long continued exertion of some muscles. The fact that the law specifically denies compensation unless the employer obtains knowlege of the injury, or notice of the same be served upon him within 90 days after its occurrence indicates an intention not to include such as the case at bar which takes months or even years to manifest itself.

This conclusion leads to a reversal of the judgment, without passing on the important question raised that timely notice of the injury was not given. Courts appear to divide, some holding that the time begins to run from the date of the accident (Cooke v. Holland Furnace Co. 200 Mich. 192, 166 N. W. 1013, L. R. A. 1918E, 552, and Central Locomotive & Car Works Co. v. Indus. Com. 290 Ill. 436, 125 N. E. 369), and others that it begins to run from the time the injury develops or manifests itself (Brown's Case, 228 Mass. 31, 116 N. E. 897, and Johansen v. Union Stockyards Co. 99 Neb. 328, 156 N. W. 511). We feel that the question should not be decided until a case presents itself wherein it is necessary so to do.

Judgment reversed.