### CANNELLA v. GULF REFINING CO. OF LOUISIANA.*
#### No. 14668.

Court of Appeal of Louisiana. Orleans.
April 23, 1934.

*Rehearing denied June 11, 1934.

Lewis R. Graham and H. R. Cabral, both of New Orleans, for appellant.

P. M. Milner, of New Orleans, for appellee.

HIGGINS, Judge.

Plaintiff seeks to recover from his employer four hundred weeks' compensation for permanent, total disability alleged to have resulted from acute lead poisoning sustained on or about July 15th, 1931, while working as a painter in the truck and automobile repair department of defendant.

Defendant denied that the plaintiff contracted "plumbism" or lead poisoning while in its employ and, in the alternative, specially pleaded that, if he did, it is a vocational disease and not an accidental injury within the meaning of the compensation statute, and further specially pleaded that plaintiff was furnished with a mask which was an adequate guard to protect him from inhaling the infinitesimal particles of lead suspended in the atmosphere and that he failed to use it.

There was judgment dismissing plaintiff's suit and he has appealed.

The record shows that the defendant owns and operates a number of trucks in connection with its business. From time to time, as these vehicles need repairs and overhauling, they are sent from various points in Mississippi, Alabama, Tennessee, and Louisiana to the plant in New Orleans. For several years plaintiff was regularly employed in the painting shop and used both a brush and a spray in the process of painting the various parts of the vehicles. A considerable volume of this work was performed. The first two coats of paint which were applied with a brush contained 23 per cent. lead. These two coats were rubbed with sandpaper or steel wool to give a proper surface for the application of the final coat of paint and thereby caused minute particles thereof to be thrown into the atmosphere. The spray from the "air pressure gun" which was used to apply the lacquer on the different parts of the trucks also caused a mist to be discharged in the air. Most of the trucks that were repainted were disassembled and the hood, fenders, headlights, etc., were sprayed under a hood which contained an exhaust fan which tended to carry off the paint which did not take effect on the part that was being sprayed. However, some of the trucks were painted on the floor without being disassembled. Due to the fact that the lacquer dried very quickly it is said that after it traveled about eighteen inches from the gun it would dry and become small dust-like or powder particles. There were three other exhaust fans in the large room where the painting

was done and two doors and several windows. The evidence shows that the doors and windows were usually kept closed in order to maintain a temperature in the room of about 85 degrees, depending upon the atmospheric condition.

Plaintiff had worked regularly using both the spray and the brush in painting trucks and a few automobiles, and up to July 15, 1931, appeared to be in good health. On Saturday, July 18, 1931, he made an automobile trip to Bogalusa with his family and complained of suffering pain in the region of his navel, and being dizzy, nervous, and nauseated. Upon returning home on Sunday he was still ill and had to go to bed. The next day he courageously tried to work but was unable to do so. He then consulted a physician who diagnosed his case as lead poisoning, for which he was given the usual treatment. Unfortunately he did not respond to the treatment and appears to have grown worse. He was then examined at the employer's insurance carrier's request by two doctors who confirmed the diagnosis of lead poisoning, and they made various tests and examinations and kept him under their observation for some time. Another doctor employed by the plaintiff reached the same conclusion as the result of an independent examination.

The plaintiff's helper who worked with him in the same room for a number of years was equally exposed, but suffered no ill effects and is normal.

There is absolutely no doubt but that the plaintiff was and is suffering from lead poisoning, and we are convinced that it resulted from absorbing and ingesting lead while working in the defendant's paint shop.

Considerable testimony and argument was devoted to the question of whether or not the poisoning was due to inhaling the spray emitted from the air pressure gun or from coming in direct contact with paint when applying it with the brush; defendant went to great length to show that the lacquer sprayed with the gun contained no lead except in one instance in May, 1931, when a paint with a lead base or pigment was used. We do not consider it necessary to determine whether the plaintiff was suffering from lead poisoning as a result of coming in contact with paint that was applied with a brush, or with a spray or particles of paint which he inhaled as a result of sandpapering the surface of the priming coats in order to prepare the vehicle for the finishing coat of paint. It makes no difference if the poison

was absorbed by his system through any one or all of these ways. In either event the result is just the same because the plaintiff suffered lead poisoning which was incidental to and arose out of his employment.

The serious issue in the case is whether lead poisoning is a vocational disease and, therefore, not compensable under the compensation statute, or an accidental injury within the meaning of the statute and hence compensable.

Section 2 of Act No. 20 of 1914, as amended and re-enacted by Act No. 85 of 1926 (page 111), reads as follows: "Be it further enacted, etc., That if an employee employed as hereinabove set forth in Section 1 (except an employee who shall be eliminated from the benefit of this act for the reasons hereinafter set forth in Section 28 of this act and elsewhere) receives personal injury by accident arising out of and in the course of such employment his employer' shall pay compensation in the amounts and on the conditions and to the person or persons hereinafter provided."

Section 38 of Act No. 38 of 1918 (page 60), amending and re-enacting sections 38 and 39 of Act No. 20 of 1914, reads as follows: "Be it further enacted, etc., That the word 'Accident,' as used in this act shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected or unforeseen event happening, suddenly or violently, with or without human fault and producing at the time objective symptoms of an injury. The terms 'Injury' and 'Personal Injuries' shall include only injuries by violence to the physical structure of the body and such diseases or infections as naturally result therefrom. The said terms shall in no case be construed to include any other form of disease or derangement, howsoever caused or contracted."

The term "vocational or occupational disease" has been defined by several of the courts as follows:

Occupational disease is one wherein the cumulative effect of employee's continued absorption of deleterious substances from his environment ultimately results in manifest pathology.

In occupational disease, any one exposure is inconsequential in itself, but the continual absorption is the factor which brings on the disease. In such cases, he can be held injured only when the accumulated effect of the deleterious substances manifest themselves. Associated Corporation v. State Com., 124 Cal. App. 378, 12 P.(2d) 1075.

"Occupational disease is a diseased condition arising gradually from the character of the employee's work." Peru Plow & Wheel Co. v. Industrial Com., 311 Ill. 216, 142 N. E. 546.

If the disability comes on gradually, it is not an accident but an occupational disease. Mauchline v. Insurance Fund, 279 Pa. 524, 124 A. 168.

"Had appellee suffered an impairment of health as the gradual result of breathing fumes from paints, * * * that would be classed as an occupational disease." Sullivan Mining Co. v. Aschenbach (C. C. A.) 33 F.(2d) 1, 3.

"In occupational diseases it is drop by drop, it is little by little, day after day for weeks and months, and finally enough is accumulated to produce symptoms." Adams v. Acme White Lead & Color Works, 182 Mich. 157, 148 N. W. 485, 486, L. R. A. 1916A, 283, Ann. Cas. 1916D, 689.

"An occupational disease * * * has its inception in the occupation and develops over a long period of time from the nature of the occupation." Matthiessen, etc., Co. v. Ind. Board, 284 Ill. 378, 120 N. E. 249, 251.

"If a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it cannot be called a result effected by accidental means; but that if, in the act which precedes the injury, something unforeseen, unexpected, unusual, occurs which produces the injury, then the injury has resulted through accidental means." United States Mutual Accident Association v. Barry, 131 U. S. 100, 9 S. Ct. 755, 762, 33 L. Ed. 60.

It will be noted that in every definition the court emphasizes the protracted and gradual development of the trouble.

The medical testimony establishes the fact that generally a person who constantly uses paint with a lead base or pigment and applies it with either a brush or a spray gradually absorbs into his body a poisonous lead substance and eventually, depending upon the idiosyncrasies of the particular individual, suffers from lead poisoning. The process of absorption is gradual and imperceptible. The symptoms slowly manifest themselves months before disability occurs. The definite symptoms are as follows:

A blue line in the gum adjacent to the teeth in both the lower and upper jaws;

Paralysis of the wrists commonly called "wrist drop";

Severe and excruciating pain in the region of the navel;

Dizziness, nausea, and in a severe case, a mental deterioration.

█ It appears to be well settled that where the lead poisoning is gradual and cumulative over a long period of time that it is not an accidental injury or disability within the meaning of the compensation statute. Associated Corporation v. State Commission, 124 Cal. App. 378, 12 P.(2d) 1075; Peru Plow Co. v. Industrial Com., supra; Mauchline v. Insurance Fund, supra; Adams v. Acme White Lead & Color Works, supra; Matthiessen, etc., Co. v. Industrial Board, supra; Daley v. H. C. Miner Co., 236 App. Div. 549, 261 N. Y. S. 189; Derkindsen v. Rundell Co., Wisconsin Industrial Commission, Report 1914, p. 16; Iwanicki v. State Commission, 104 Or. 650, 205 P. 990, 29 A. L. R. 682; Miller v. American Steel & Wire Company, 90 Conn. 349, 97 A. 345, 349, L. R. A. 1916E, 510; Associated Ind. Corp. v. State Commission, 124 Cal. App. 378, 12 P.(2d) 1075; Clinchfield Corp. v. Kiser, 139 Va. 451, 124 S. E. 271, 274; Johnson v. London Acc. Co., 217 Mass. 388, 104 N. E. 735; Moore v. Service Truck Co., 80 Ind. App. 668, 142 N. E. 19; Seattle Co. v. Dept. of Labor, 147 Wash. 303, 265 P. 739; U. S. Gypsum Company v. McMichael, 146 Okl. 74, 293 P. 773, 777; Wenrich v. Industrial Commission, 182 Wis. 379, 196 N. W. 824; Young v. Melrose, 152 Minn. 512, 189 N. W. 426, 29 A. L. R. 506; Zajkowski v. American Steel Co. (C. C. A.) 258 F. 9, 6 A. L. R. 348; Ohio Industrial Commission v. Brown, 92 Ohio St. 309, 110 N. E. 744, L. R. A. 1916B, 1277; United States Mutual Accident Association v. Barry, supra; Thomas v. Ford Motor Company (1925) 114 Okl. 3, 242 P. 765; Chop v. Swift & Co., 118 Kan. 35, 233 P. 800 (1925). We note also the following English Cases: Steel v. Cammel Laird Co., 2 K. B. 232; Williams v. Duncan, 1 W. C. C. 123; Brinton's v. Tarver. 74 L. J. K. B. 474.

However, there are authorities which hold that where the lead poisoning is acute it is an accidental injury and, therefore, compensable.

The medical testimony in this case shows that in cases of acute lead poisoning, the patient is normal and healthy and within a few hours or several days after coming in contact with the lead paint (absorption taking place through the skin and by inhaling the deleterious fumes), the usual symptoms characteristic of lead poisoning evidence them-

selves and the patient is deathly sick and disabled.

In the instant case the plaintiff, up to July 15, 1931, was in good health, and we have already explained how he was stricken.

The lay testimony of both the plaintiff and the defendant shows that the claimant was in a normal, healthy condition up to July 15th, and worked regularly. The medical testimony introduced by plaintiff shows that he suffered from the effects of acute lead poisoning. Although the doctor who testified for the defendant took the witness stand after this expert evidence was given on behalf of plaintiff, he did not take issue with the accuracy of this diagnosis; consequently, we conclude that the plaintiff's disability is due to acute lead poisoning. Where a problem is peculiarly within the domain of medical science we must largely depend upon the professional light given to us in the form of expert testimony, so that if our conclusion that the plaintiff is suffering from acute lead poisoning and not chronic lead poisoning is erroneous the responsibility therefor must rest with the medical profession. American, etc. Co. v. Commission, 353 Ill. 324, 187 N. E. 495, 497; Brent v. Union Indemnity Co., 17 La. App. 689, 135 So. 735.

In the case of Matthiessen & Hegeler Zinc Co. v. Industrial Board et al., 284 Ill. 378, 120 N. E. 249, 250, the administrator of Joseph Adrian claimed compensation for his death as a result of accidental injury in the course of his employment with the defendant which was engaged in the business of smelting zinc ores. The evidence shows that the deceased had worked for the defendant for thirty-eight years and for a period of sixteen years had been fireman at the furnaces in the smelters. His duties required him to draw the scum or oxides off the surface of the molten zinc. This refuse fell on the platform in front of the furnaces giving off vapors and fumes until it cooled. There was a hood over the furnace, but it did not extend far enough to take away all of the gases that were generated and emitted. The smeltered ore contained 99% zinc and a fraction less than two-tenths of one per cent. of lead and some arsenic. In the fifty years that the defendant was in business it had never known of any case of lead, zinc, or arsenical poisoning. Up to October 6, 1914, deceased had been in good health, but on that day he left home feeling badly and about 2 o'clock in the afternoon returned home with dysentery. At about 8 o'clock that night he was seized with cramps in the arms, legs, chest, stomach, and bowels, and on October 14th succumbed.

The Supreme Court in its opinion states that the Industrial Board found that his death "was due to acute arsenical poisoning not of a chronic nature, or a culmination of a gradual development of a long course of poisoning."

The defendant complained of two errors in the judgment: "first, that the Workmen's Compensation Act only provides compensation for accidental injuries and there was no evidence that any accident happened to Adrian; second, that Adrian's death was caused by an occupational disease, which is not accidental within the meaning of the act."

The compensation statute provided that compensation would be paid for accidental injury sustained by an employee growing out of and during the course of his employment. In construing the language of the statute the court said:

" * * * The word 'accident' is not a technical legal term with a clearly defined meaning, and no legal definition has ever been given which has been found both exact and comprehensive as applied to all circumstances. Different definitions are given, with a very full citation of cases, in 1 Corpus Juris, 390. Anything that happens without design is commonly called an accident, and at least in the popular acceptation of the word any event which is unforeseen and not expected by the person to whom it happens is included in the term. Different meanings are given to the word where it is made the ground for equity jurisdiction and where it occurs in accident insurance, and as applied to injuries to a servant without negligence of the master and for which he has not been held liable. The meaning of the word as used in the Workmen's Compensation Act is necessarily influenced by the various provisions of the act and the purpose of its enactment, and cannot be determined, alone, from any definition found in a dictionary. * * *

"While it is not intended, and perhaps not possible, to give a definition of the words used in the act as applied to all possible circumstances, it may safely be said that an injury is accidental, within the meaning of the act, which occurs in the course of the employment unexpectedly and without the affirmative act or design of the employee. In this case there was evidence from which the Industrial Board was warranted in finding that on October 6, 1914, in the course of the employment of Adrian he contracted arseni-

cal poisoning which resulted in his death. It is true that Adrian had been exposed to practically the same conditions for many years without injury, but it would not be unreasonable to conclude that his immunity was because of the state of his health and his ability to resist the deleterious effect of the gases and fumes over which he worked; but this time his physical condition was such as to make him susceptible to arsenical poisoning in such a degree as to bring on his fatal illness and death. There was sufficient competent evidence before the board to sustain the finding and it cannot be disturbed."

With reference to the defense of occupational disease the court said: "The second objection to the judgment is that Adrian died from an occupational disease incident to the business of smelting zinc. A disability caused in that way or from that source is not to be regarded as an accident, because such a disease has its inception in the occupation and develops over a long period of time from the nature of the occupation and not from any unusual or unforeseen cause or event."

The court finally concluded that the evidence did not establish that arsenical poisoning was a disease incidental to the occupation in question and affirmed the award in favor of the plaintiff.

In the case of Jefferson Printing Company v. Industrial Commission, 312 Ill. 575, 144 N. E. 356, 358, the widow claimed compensation for the death of her husband, alleging that he had been accidentally infected with erysipelas when the employer's physician vaccinated him against smallpox in accordance with the public health authorities' requirements. The court in passing upon the question of accidental injury said: "Plaintiff in error's counsel contends there was no accidental injury arising out of and in the course of the employment shown by the testimony. An accidental injury, within the meaning of the act, is one which occurs in the course of the employment unexpectedly and without the affirmative act or design of the employee. But the word 'accident' is not to be technically construed. It may comprehend any event which is unforeseen and not expected by the person to whom it happens. Matthiessen & Hegeler Zinc Co. v. Industrial Board, 284 Ill. 378, 120 N. E. 249. The act of vaccination of Lasseter was not unexpected and was in itself not an accident. The infection was not expected. Whether it was traceable to the act of vaccination was a question of fact."

The judgment in favor of the claimant was reversed on the ground that the risk of vaccination was not incidental to the employer's business, but was one to which the general public was likewise subjected or exposed and further that there was not sufficient evidence to show that the infection resulted from the vaccination.

In the case of Sullivan Mining Company v. Aschenbach (C. C. A.) 33 F.(2d) 1, the issue is stated as follows: "The sole question for decision is of the meaning of the term 'accident' as it is used in the Workmen's Compensation Law of Idaho."

The plaintiff worked as a painter for the defendant from January 13 to January 20, 1928. His duties required him to paint the inside of a new zinc smelter with paint and a thinner which were furnished by the employer. The first day he experienced headaches which subsequently became increasingly distressing, resulting in the loss of appetite and ability to sleep. Finally, on the 20th, he became very sick and irrational and was taken to the hospital. It was later discovered that the thinner, unknown to plaintiff, contained carbon disulphide, a volatile substance which gave off a poisonous gas. The employee was not warned of its dangerous effects and became ill as a result of inhaling it. In dealing with the issue of whether or not the plaintiff's trouble resulted from an accident the court said:

"Section 6217 of the act provides that, 'If a workman receives personal injury by accident arising out of and in the course of any employment covered by this chapter his employer or the surety shall pay compensation,' etc. The act itself attempts no comprehensive definition of the words 'accident' or 'accidental.' By section 6324 it is declared that such injury does 'not include a disease except as it shall result from the injury,' and by section 6323 as amended in 1927 (1927 Sess. L. p. 148), that, 'An "injury" or "personal injury" to be compensable must be the result of an accident.' By the Supreme Court of the state, however, the term has been construed, and, under familiar principles, by that construction we are bound. In McNeil v. Panhandle Lbr. Co., 34 Idaho, 773, 786, 203 P. 1068, 1073, the court said the act 'is to be liberally construed with a view to effect its object and promote justice. * * * This does not mean that the courts should endeavor by construction to extend its provisions to persons not intended to be included by it, but that it shall be

so construed as to carry out its purposes and, as far as is reasonably possible, secure its benefits to all those who were intended to receive them. * * *

"In common understanding we think plaintiff's injury would be regarded and spoken of as accidental, or, in more technical language, as 'an unlooked for mishap or an untoward event which was not expected or designed.' Nor do we think the injury was in any real sense an occupational disease. It was more in the nature of an acute case of poisoning. Had appellee suffered an impairment of health as the gradual result of breathing fumes from paints in common use and of working under ordinary conditions, that would be classed as an occupational disease. But here his disability resulted unexpectedly and suddenly from an unusual agency. Hazard from its use was not a common incident of a painter's occupation, but was fortuitous. The distinction between such a case and an occupational disease is clearly recognized in Mauchline v. State Insurance Fund, 279 Pa. 524, 124 A. 168; Industrial Commission of Ohio v. Roth, 98 Ohio St. 34, 120 N. E. 172, 6 A. L. R. 1463; Victory Sparkler & Specialty Co. v. Francks, 147 Md. 368, 128 A. 635, 44 A. L. R. 363; and Moore v. Service Motor Truck Co., 80 Ind. App. 668, 142 N. E. 19, 20."

The court further said: "Decisions in great number from other states have been collected in the briefs, particularly in appellee's brief; but we think that no useful purpose would be subserved by an attempt to review them. They exhibit much diversity some of which may be accounted for by differences of fact or in statutory provisions. For example, a requirement that to be compensable the injury must result from 'violent or external means,' as in Oregon, or that the disability must result from a traumatic injury, as in Kentucky, would seem to present a materially different case. So where, as in Massachusetts and some other states, the word 'accident' is not used but only 'injury,' the law is more susceptible to differing interpretations. Undoubtedly the diversity cannot all be explained by either differences in statutory provisions or in point of fact and must to some extent be attributed to a difference of general judicial attitude. This condition is recognized by the Supreme Court of Idaho, and we think that it has unequivocally indicated that it stands with those courts which have taken the more liberal view of the law and given to it a broader meaning, and to its views we must defer.

That such an attitude is not exceptional or without basis of reason, see, in addition to cases already cited, Carroll v. Industrial Com. of Colo., 69 Colo. 473, 195 P. 1097, 19 A. L. R. 107; Matthiessen, etc., Co. v. Indust. Board, 284 Ill. 378, 120 N. E. 249; Fidelity & Casualty Co. v. Indust. Board, 177 Cal. 614, 171 P. 429 [L. R. A. 1918F, 856]; Dove v. Alpena Hide, etc., Co., 198 Mich. 132, 164 N. W. 253; Van Vleet v. Public Service, etc., 111 Neb. 51, 195 N. W. 467; Tintic Milling Co. v. Industrial Commission, 60 Utah, 14, 206 P. 278, 23 A. L. R. 325; New Marissa Coal Co. v. Industrial Commission, 326 Ill. 116, 157 N. E. 32; Houston Packing Co. v. Mason (Tex. Civ. App.) 286 S. W. 862; U. S. Fid. & Guaranty Co. v. Indust. Commission, 76 Colo. 241, 230 P. 624; and even under the restrictive language of the Oregon Law, Dondeneau v. State Indust. Accident Com., 119 Or. 357, 249 P. 820, 50 A. L. R. 1129."

The court having concluded that it was an accident within the meaning of the Compensation Law, reversed the judgment, awarding damages in favor of the plaintiff, as the law required him to resort to the compensation statute for redress. (The United States Supreme Court refused a writ in the case. 280 U. S. 586, 50 S. Ct. 35, 74 L. Ed. 635.)

In the case of Industrial Commission v. Roth, 98 Ohio St. 34, 120 N. E. 172, 173, 6 A. L. R. 1463, the Supreme Court of Ohio held that lead poisoning contracted by a painter as the result of heating lead paint in a closed room was not an occupational disease. A thorough consideration of the question of whether lead poisoning is an accidental injury or an occupational disease was given, the court saying: "It is also common knowledge that in the occupation of a painter the exposure is so slight that this disease is slow and insidious in its development, and chronic in its character. In fact, the history of the development of this disease in this occupation shows that it is a matter of years instead of days," etc.

In a recent Ohio case, Industrial Commission v. Tolson, 37 Ohio App. 282, 174 N. E. 622, 626, a miner had worked as such for many years and on September 28, 1926, he set off a blast. Shortly thereafter he became ill and died on October 2, 1926, from the effects of carbon monoxide poisoning. It was contended by the defendant that the proof was insufficient to show accidental injury within the meaning of the act as he might have contracted the poisoning over a long period of

time. The court said: "Can it then be successfully maintained that such an influence, such an effect upon the body, is not an injury? * * * It injures the blood * * * by loading it with poison. * * * It is difficult to believe that this odorless, invisible, deadly thing * * * does not * * * inflict an injury."

. In the case of Ramsay v. Sullivan Mining Co., 51 Idaho, 366, 6 P.(2d) 856, 858, the claimant was employed to weld the bottom of lead tanks. Fumes and gases were given off by the molten lead and he did not use a mask. He started to work in the early part of November and about three weeks later showed signs of nervousness and colic, etc., and on December 22, became gradually ill and, thereafter, his left arm became paralyzed. The court said: "The evidence shows that the * * * lead being absorbed * * * brought about a result in a few weeks which * * * would usually take * * * months or possibly years, and, as to time, it was not the customary or natural result that follows the absorption of lead * * * into the system. Therein lies the distinction between an occupational disease and an injury by accident."

In the case of Naud v. King Sewing Machine Co., 95 Misc. 676, 159 N. Y. S. 910, 912, where it was alleged that the New York statute provided for compensation for "accidental injury * * * arising out of and in the course of his employment," and that the plaintiff contracted lung trouble through inhaling gases over a considerable period of time, there being a lack of proper ventilators to carry off the poisonous gases in the defendant's shop, the court held this set forth an accident as distinguished from a vocational disease.

It appears that this issue has never been passed upon by an appellate court of this state. However, in the case of Taylor v. List & Weatherby Const. Co., Inc., et al. (La. App.) 146 So. 353, the defendant admitted that the plaintiff sustained an accidental injury arising out of his employment when he became afflicted with Caisson disease, i. e., a condition brought about by excessive air pressure which causes a great amount of nitrogen to be forced into the tissues of the body and, if the human system is not strong enough to expel this gas, it causes gas emboli or bubbles to form in the tissues of the body resulting in severe pain and paralysis. The court awarded compensation.

In the case of Reichler v. S. W. Gas Co., 9 La. App. 501, 121 So. 314, it was claimed that the disability resulted from poisoning through paint. While the decision was against the plaintiff on the ground that the court concluded that he did not have the injuries of which he complained, the language of the court would indicate that if the evidence had been considered adequate that the plaintiff would have had a cause of action.

In Wright v. La. Ice & Utilities Co., 14 La. App. 621, 129 So. 436, and Id., 19 La. App. 173, 138 So. 450, in both of which cases writs were refused by the Supreme Court, the court placed a liberal construction upon the statute in favor of the claimant as to what constituted an accident and held that a petition alleging that an employee delivering ice, entered a customer's house, dying immediately as the result of acute dilatation of the heart superinduced by over-exertion, set forth a cause of action. On the trial of the case on the merits the court held that the claimants were entitled to compensation even though the evidence showed that the heart of the deceased was diseased.

In Becton v. Deas Paving Co., 3 La. App. 683, it was held that where excessive heat caused dilatation of the heart and hemorrhage of an artery, it was an accident within the meaning of the statute. Apparently the accident was not due to any one sudden exposure, but was cumulative, as he exposed himself to the heat many times during the day.

On several occasions it has been held that prostration from heat is a violent accident. Schulz v. Great A. & P. Tea Company, 331 Mo. 616, 56 S.W.(2d) 126; State Roads Comm. v. Reynolds, 164 Md. 539, 165 A. 475; Herbert v. State, 124 Neb. 312, 246 N. W. 454.

It appears that the exact cause of heat prostration is not definitely known, or, to say the least, is much more indefinite than the known cause of lead poisoning. If the imperceptible and cumulative effect of heat is held to be an accident within the meaning of the act, can it be reasonably and fairly said that acute lead poisoning is not an accident, when the inhalation of ingestion of the poison is really more violent to an organ or tissue than is heat?

The medical testimony shows that violence is done to both the blood and the intestines as the result of lead gaining admittance to the human system.

It seems that the defense of vocational disease is based upon the theory of assumption of risk of diseases which are characteristic to the particular occupation, such, for example, as the gradual and cumulative effect

of lead in the system, medically termed "chronic lead poisoning." Does a painter assume the risk of acute lead poisoning which develops in a few hours or days as distinguished from chronic lead poisoning which required several months and sometimes years to develop?

Under the law with reference to master and servant the doctrine of assumption of risk applied only to usual risk—and not unusual or extraordinary risks. 39 C. J. 691. To say that a claimant who sustained acute lead poisoning is not entitled to recover compensation because it is a vocational or occupational disease would be announcing a stricter application of the doctrine of assumption of risk with reference to compensation cases than was applied to cases arising under the law of master and servant.

[4] It is well established by the numerous authorities of this state that the Compensation Act is to be liberally construed in favor of the claimant. Behan v. Honor Co., 143 La. 348, 78 So. 589, L. R. A. 1918F, 862; and Weller v. Turnerized Roofing Co. et al., 14 La. App. 150, 129 So. 443; Favre v. Werk Press Cloth Manufacturing Company (La. App.) 152 So. 694. We may add that there is also a disposition toward liberality in favor of the claimant on the part of the legislative branch. For example, in Massachusetts recovery is had "for personal injury" without qualification or restriction as to accidental injury and the Supreme Court there held that chronic lead poisoning was compensable. Johnson v. London Guarantee & Accident Company, Ltd., 217 Mass. 388, 104 N. E. 735.

The English Compensation Act has been amended so as to cover some industrial diseases, although theretofore recovery was limited to "personal injury by accident." See English cases, supra.

There is no doubt that the acute lead poisoning from which the plaintiff suffered was unexpected and unforeseen and happened suddenly or violently with or without human fault and produced at the time objective symptoms. Surely there was enough evidence of violent injury to the physical structure of the body and by no process of logical or fair reasoning can it be said that a person who is suffering from acute poisoning is afflicted with a disease. We conclude that the plaintiff suffered accidental injury and disability within the meaning of the compensation statute and not a vocational or occupational disease.

The defense that plaintiff is not entitled to recover because he failed to use an adequate guard or protection against accident provided by his employer is founded upon paragraph 1, § 28, of Act No. 20 of 1914, the relevant part of which reads as follows: "(3) by the injured employee's deliberate failure to use an adequate guard or protection against accident provided for him."

The evidence tends to show that at the time the spray gun was introduced in defendant's paint shop a mask was furnished the plaintiff that fitted over the nose, in order to prevent him from inhaling the lacquer which was sprayed into the atmosphere. The evidence convinces us that at the time the plaintiff is said to have abandoned the use of the mask and put into his nostrils moistened pieces of cotton, he did so for the reason that the mask was so ineffective that he inhaled a sufficient quantity of the paint to be able to expectorate it.

Furthermore, defendant's foreman stated that after the hood with the exhaust fan was installed in the paint shop he did not think it necessary that the mask should be used and, therefore, did not complain when the plaintiff appeared to be working without it. There is nothing in the evidence which would tend to show that the plaintiff "deliberately" failed to use an adequate guard to protect himself against lead poisoning. Finally, we may say, in passing, that if the evidence of the defendant to the effect that the lacquer used in the spray gun did not contain any lead is correct, and we believe it to be so, then there would have been no purpose in requiring the plaintiff to use the mask to protect himself against lead poisoning from that source. It is not contended that he was also supposed to use the mask while painting with a brush. Jones v. Landry, 10 La. App. 740, 122 So. 913; McClendon v. La. Central Lumber Company, 17 La. App. 246, 135 So. 754; Hutchinson v. Southern Advance Bag & Paper Co. (La.App.) 150 So. 872.

Having come to the conclusion that the three defenses interposed by the defendant are not well founded in law and in fact, it follows that the judgment of the lower court should be overruled.

The medical evidence of both the plaintiff and the defendant convinces us that the plaintiff is permanently and totally disabled to do work of any reasonable character. The report of the two doctors for the defendant dated March 14, 1933, and March 20, 1933, show that the plaintiff had undergone such

mental deterioration as a result of the lead poisoning that he was unable to work.

For the reasons assigned the judgment appealed from is annulled, avoided, and reversed, and it is now ordered that there be judgment in favor of the plaintiff, Joseph Cannella, and against the defendant, Gulf Refining Company, awarding him compensation at the rate of $19.50 per week for a period not exceeding 400 weeks commencing July 20, 1931, with legal interest on each delinquent installment from its due date until paid. Defendant to pay the costs of both courts.

Reversed.