147 So.2d 711 (1962)
Valentino J. COMOLETTI
v.
IDEAL CEMENT COMPANY.
No. 5694.
Court of Appeal of Louisiana, First Circuit.
December 14, 1962.
*713 Kantrow, Spaht & Kleinpeter, by Robert L. Kleinpeter, Baton Rouge, for appellant.
Dyer & Wilson, by Billy O. Wilson, Baton Rouge, for appellee.
Before ELLIS, LOTTINGER, HERGET, LANDRY and REID, JJ.
LANDRY, Judge.
Plaintiff, Valentino J. Comoletti, a laborer in the employ of defendant, Ideal Cement Company, instituted this action against his said employer seeking judgment for maximum workmen's compensation benefits for alleged total permanent disability attributed to a partial loss or impairment of hearing. Our learned brother below rendered judgment in favor of plaintiff decreeing him entitled to compensation in the sum of $35.00 weekly for a maximum period of 400 weeks and from said unfavorable judgment defendant has appealed.
Defendant earnestly contends that our esteemed brother below erred in two respects. First, it is contended the court erred in finding that plaintiff did in fact suffer an accidental injury within the contemplation of the workmen's compensation act. Secondly, and alternatively, defendant maintains that if plaintiff did sustain an accidental injury, the trial court erred in awarding him total and permanent disability benefits when in fact plaintiff sustained only a partial loss of a physical function and should have been awarded maximum compensation for a period of 100 weeks only, as provided for by LSA-R.S. 23:1221(4) (p).
Defendant's business entails operation of five huge "kilns" which the record reveals to be large cylindrical ovens in which the basic ingredients of cement are mixed and blended. Though mounted horizontally on concrete foundations known as brackets, the kilns are not perfectly level but are slightly inclined or slanted, their lower ends being so constructed as to permit opening to allow removal of the finished product. If we understand the testimony correctly, the upper or higher end of each kiln is equipped with devices by means of which raw materials are fed into the kilns and therein mixed, under extreme heat and pressure, resulting in the finished product, cement. The extremely high temperature required for the manufacturing process is achieved by combustion of natural gas injected into each kiln or oven by means of an apparatus referred to as a "rolling tube", the exact nature and location of which is not made clear by the testimony. In the course of producing cement in the manner indicated, it appears that the interiors of the kilns or ovens accumulate large mud rings referred to in the industry as "clinkers" which must be removed from time to time. It is undisputed that the dislodging and removal of clinkers from the kilns does not require that the fire therein be completely extinguished.
The process of clearing the kilns of clinkers is known as "shooting the kilns" which terminology, as will hereinafter appear, both accurately and graphically describes the procedure employed. The record reveals that on the right side of each oven are situated small holes or "ports" through which the barrel of an 8-gauge shell gun (much in the order of a conventional shotgun) is inserted and by means of which the mud rings or clinkers are literally "shot" from the walls of the kilns. Although the record does not reveal at which end of the kilns these ports are situated, the absence of such information is of little importance to the decision of this matter. It does appear, however, that a team of three men is required to discharge the gun which fires a single large lead projectile in the nature of a bullet. The barrel of the gun is inserted into a port by the "fireman" who aims and fires the gun. The fireman is assisted by a second individual who loads the gun by inserting shells in the breech to keep the weapon loaded and the third and remaining member of the team directs an air hose upon the gun to keep it sufficiently cool in order that the operation may continue without interruption.
*714 Dependent upon the condition of the interiors of the respective kilns from 25 to 750 rounds are required to be fired in the process of cleaning each kiln. A team delegated to "shoot the kilns" is generally engaged in the process for a period of from four to five hours. Each shot admittedly results in a loud report producing considerable noise. It is undisputed that as a general rule temperature is reduced in the kilns (resulting likewise in a reduction of pressure) to facilitate the cleaning process in that the employees so engaged are afforded a better view of the interior of the kiln. It is conceded, however, that occasionally the process is undertaken with little or no reduction in temperature and that performing the work under high temperature and pressure intensifies the noise produced by the explosion of each shell fired.
Plaintiff was employed by defendant for approximately four years preceding the date of the accident and had, on many occasions, been required to assist in "shooting the kilns". On the date of the alleged "accident", namely, July 28, 1960, after having been engaged in shooting the kilns for a period of two or three hours, plaintiff and two fellow workers, Burton Dufour and Burton J. Pritchard, began to shoot the Number Five or last kiln. For some reason (not appearing in the record) Number Five kiln was shot without reducing the temperature therein, consequently, the intensity of the noise produced by each shell fired into said kiln was somewhat louder than usual. Plaintiff, who was acting as loader, inasmuch as he was inserting shells into the gun, testified that the noise was such that he had placed rags over the sides of his head to protect his ears. He suddenly felt what he described as "an excess stunned blow" in his ear of greater intensity than ordinarily occasioned by the shooting. The extreme loudness of the reports caused plaintiff to experience a stunned feeling accompanied by an aching in his ears which affected him to the extent that he jumped away from the kiln two or three times.
Burton Dufour testified that the process of shooting the kilns ordinarily results in considerable noise and that cleaning the kilns without reducing temperature does intensify the noise. He recalled the incident in question and although he conceded the temperature was not lowered in Number Five kiln on the date in question, it was his opinion that, on said date, there was no greater noise or concussion than on any other occasion. He recalled that plaintiff immediately reported experiencing a whistling in his ears and acknowledged that plaintiff had never before made such a complaint.
The third member of the team, namely, Burton J. Pritchard, testified that he had no independent recollection of the incident.
On the day following the incident plaintiff complained to his superior, Earhart, who informed plaintiff that, if the ringing and whistling sounds plaintiff was experiencing in his ears did not clear up within a day or so, he, Earhart, or Mr. Glass (the personnel manager) would refer plaintiff to a doctor. Plaintiff's condition failed to either improve or clear up and upon plaintiff's further complaint, Mr. Glass referred plaintiff to Dr. Thomas P. Raggio, an otolaryngologist, a physician specializing in treating diseases and disorders of the ear.
Mr. Earhart testified he did not recall whether plaintiff reported an unusual injury or complained of experiencing pain. Neither did he recall referring plaintiff to the Personnel Manager Glass, although he freely conceded that such occurrence was possible. He acknowledged that on August 1, 1960, he was informed that plaintiff was not to be employed in the kiln area upon recommendation and advice of medical authority.
Dr. Raggio first examined plaintiff on August 2, 1960, on which date he found no evidence of physical abnormalities in plaintiff's ears, nose or throat. He observed no objective symptoms of injury such as scar tissue, bleeding or evidence of rupture of *715 the ear drums. Neither did he note any changes in the bony structure of the ear which might be detected upon clinical examination. Dr. Raggio's examination consisted of administration of repeated audiometric tests in addition to an examination designed to determine discrepancy in hearing perceptibility as between normal bone conduction and normal air conduction, if any. Dr. Raggio found that, in addition to plaintiff's subjective complaint of experiencing ringing and whistling sounds, especially in the right ear, plaintiff was suffering from a high tone hearing loss with slight impairment of ability to understand speech. He found, however, that within the range of speech sounds, plaintiff's hearing was considered to be above a practical level. More precisely, Dr. Raggio concluded that with respect to the upper limit of speech range, namely, 2000 cycles, plaintiff's hearing was well above the practical level but that at higher frequencies his hearing decreased so that at 4000 cycles plaintiff's hearing was below practical level. The term "practical level of hearing" was explained by Dr. Raggio as follows: impaired hearing ranges from normal or zero to what is considered the lowest practical level, the difference between normal and lowest practical level being 30 decibels. More precisely, Dr. Raggio found that with respect to high tones, such as whistles and bells, plaintiff's hearing was impaired and that plaintiff had difficulty in hearing shrill, high pitched sounds.
Upon Dr. Raggio's first examination of plaintiff, Dr. Raggio felt that the ringing sensation experienced by plaintiff as a result of the acoustic trauma shown would subside in a few days although he considered plaintiff's hearing impairment permanent and unlikely to improve. No specific treatment was indicated or prescribed excepting Dr. Raggio's recommendation that plaintiff refrain from working in any area of high noise intensity. Plaintiff was again examined by Dr. Raggio on November 3, 1960 (approximately three months following the incident in question), on which date the symptoms and findings were essentially as ascertained on the prior examination. On February 3, 1961, Dr. Raggio again examined plaintiff and found no change. During this last examination Dr. Raggio detected slight improvement in plaintiff's hearing in the lower range of sounds but attached no significance thereto for the reason that he attributed such improvement to the difference in the volume at which the test was conducted. Plaintiff was examined by Dr. Raggio again on November 13, 1961, three days prior to trial, with the same results.
To the suggestion of esteemed counsel for defendant that plaintiff's condition could be the manifestation of a congenital defect or other cause, Dr. Raggio explained that when he examined and tested plaintiff the hearing deficiency was present but that the time of its initial manifestation or inception could not be determined. Further, Dr. Raggio stated that the only manner in which the defect could be established as congenital in nature is comparison of plaintiff's present condition with an audiogram made prior to the alleged injury. Causation, according to Dr. Raggio, is established by investigating the patient's history for evidence of events or conditions generally recognized as causes of such hearing loss, which events or conditions can then be associated with the symptoms noted. For example, Dr. Raggio stated that if a patient experienced impairment of hearing and a ringing sensation in his ears shortly after taking large doses of quinine for malaria, the conclusion would be almost definite and positive that the incidents were causally related. In addition, Dr. Raggio was of the opinion that further exposure to loud industrial noise would result in a continuance of plaintiff's symptoms (ringing in the ears) and would in all probability, further impair plaintiff's hearing in the lower or ordinary conversation range. For this reason he strongly recommended that plaintiff avoid employment which subjected him to unusually loud noises.
*716 Defendant correctly contends that an employee seeking compensation benefits must prove an accident within the scope and during the course of his employment as well as causal connection between such accident and the alleged injury and disability. Lasha v. Indemnity Insurance Co. of North America, La.App., 108 So.2d 675; Prejean v. Bituminous Casualty Corporation, La.App., 125 So.2d 221.
We believe the causal connection in the present case to be amply shown. Dr. Raggio testified that plaintiff's condition could have been caused by the noises attending shooting the kilns. He recommended that plaintiff refrain from working in areas of high noise intensity to avoid further impairment of plaintiff's hearing, namely, in the lower sound ranges approaching the range of speech. Plaintiff's testimony is uncontradicted to the effect that he experienced the same symptoms temporarily after each instance of shooting the kilns. In this respect plaintiff's testimony is corroborated by evidence in the record of the high intensity of noise involved in the aforesaid operation and is consistent with Mr. Earhart's reaction to plaintiff's complaints, namely, Earhart's assuming the responsibility of referring plaintiff to a physician if plaintiff's symptoms (ringing in the ears) did not improve.
Closely interrelated with the question of causation is defendant's contention that plaintiff's disability did not result from an accident but from occupational disease and is therefore noncompensable. In this regard defendant's position is predicated upon that line of jurisprudence which holds that disability resulting from occupational disease does not fall within the contemplation of our Workmen's Compensation Statute and more particularly upon Cannella v. Gulf Refining Co., La.App., 154 So. 406, and Valentine v. Godchaux Sugars, Inc., La. App., 90 So.2d 442.
It is conceded that plaintiff's disability is not covered by the fairly recent occupational disease amendment to our workmen's compensation statute and that to recover herein plaintiff must establish the occurrence of an accident.
We cite with approval the following language appearing in Valentine v. Godchaux Sugars, Inc., La.App., 90 So.2d 442, which we believe accurately summarizes the law of this state with respect to the question of disability resulting from accident as distinguished from disability produced by occupational disease:
"Long before the enactment of the occupational disease amendment we discussed occupational diseases and the necessity for an accident in order that the plaintiff be entitled to recovery. See Cannella v. Gulf Refining Co., La. App., 154 So. 406, 408. There the plaintiff was engaged as a painter and inhaled paint fumes over a long period of time and this caused our discussion of the meaning of the term `"vocational or occupational disease"'. We said:
"`The term "vocational or occupational disease" has been defined by several of the courts as follows:
"`Occupational disease is one wherein the cumulative effect of employee's continued absorption of deleterious substances from his environment ultimately results in manifest pathology.
"`In occupational disease, any one exposure is inconsequential in itself, but the continued absorption is the factor which brings on the disease. In such cases, he can be held injured only when the accumulated effect of the deleterious substances manifest themselves. Associated [Indemnity] Corporation v. Industrial Accident Comm., 124 Cal.App. 378, 12 P.2d 1075.
"`Occupational disease is a diseased condition arising gradually from the character of the employee's work." Peru Plow & Wheel Co. v. *717 Industrial Comm., 311 Ill. 216, 142 N.E. 546.
"`If the disability comes on gradually, it is not an accident but an occupational disease. Mauchline v. [State] Insurance Fund, 279 Pa. 524, 124 A. 168.'
"We found, however, that, as a matter of fact, there had been an accident and that therefore the plaintiff was entitled to recover since the evidence showed that though the plaintiff had been inhaling the paint fumes for quite some time, he had been overcome at a particular specified time and that therefore it could be said that an accident had occurred. We said:
"`There is no doubt that the acute lead poisoning from which the plaintiff suffered was unexpected and unforeseen and happened suddenly or violently with or without human fault and produced at the time objective symptoms.'"
"In Robichaux v. Realty Operators, Inc., 195 La. 70, 196 So. 23, the Supreme Court having granted a writ of certiorari, reversed our decree which had been in favor of the defendant. We had held that the occurrence to which plaintiff pointed as an accident had been of such slight importance that it could not be classified as an accident. The Supreme Court held that, however unimportant it might seem at the time, if there was an accident and the ultimate condition of the employee could be traced back to that slight accident there could be recovery, but the Supreme Court definitely held that there must be an accident and pointed to the fact that the plaintiff there was able to point out the exact time and place at which the very slight accident had occurred.
"In Mitchell v. Department of Highways, La.App., 27 So.2d 646, 649, cited by counsel for plaintiff, the Court of Appeal for the Second Circuit discussed at length occupational diseases and held that the condition of the plaintiff had resulted from an occupational disease and not from accident and that therefore there could be no recovery. In that case, as in many others, the Court quoted the definition of the word `accident' as it appears in our compensation statutes:
"`* * * "The word `Accident,' as used in this act, shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected or unforeseen event happening, suddenly or violently, with or without human fault and producing at the time objective symptoms of an injury."'
"In Yaw v. Mathieson Alkali Works, La.App., 26 So.2d 718, 719, recovery was allowed a plaintiff who suffered as a result of inhaling gas fumes. However, the Court found that the plaintiff had inhaled the particular fumes at a specified time. The Court said:
"`* * * If plaintiff's account of the happening is true, the event was sudden, if not wholly unexpected, and produced objective symptoms of an injury. It was not a result produced over a long period of time by exposure to the gas fumes. * *'
"In Glover v. Fidelity & Casualty Co., La.App., 10 So.2d 255, 256, the disability resulted from the fact that at a particular time `plaintiff * * * got a lot of the dust in his eye and that he rubbed his eye, which aggravated the pain.'
"In Harris v. Southern Carbon Co., Inc., La.App., 162 So. 430, 433, the disability resulted from a cancerous condition or growth on one of the legs of plaintiff. It was held that though plaintiff had had a pre-existing cancerous condition, it was accelerated and aggravated by the fact that while climbing *718 a pole to fix certain electrical insulation, his right foot slipped and in order to save himself he violently struck the climbing spur on his foot and the strap on the spur `skinned the back of his leg'. Definitely, that occurrence could be classified as an accident.
"In Stuckey v. City of Alexander, La.App., 81 So.2d 46, 47, the latest decision on this particular question, the Court of Appeal for the First Circuit considered a case in which the employee suffered from a disease known as psittacosis. The Court held that there could be no recovery, saying:
"`* * * No evidence was adduced to show that the disease was contracted through a scratch, bruise or other injury or violence to the physical structure of the body.'
"Counsel for plaintiff confidently cites Malone's Louisiana Workmen's Compensation Law Practice, 1955 Pocket Part, section 218, page 27:
"`Our courts have held in the past that an accidental injury which demonstrably weakens the worker's resistance so that a dormant tubercular condition is activated entitles the victim to compensation for the entire resulting disability. This conclusion should not be affected by anything contained in the Occupational Disease Section, for in such a situation the claimant is seeking compensation for an accidental injury, and tuberculosis is properly regarded merely as an aggravating factor.'
"We agree fully with this statement. It means that if there is an occupational disease which is within the contemplation of the pertinent amendment, there may be recovery even without an accident and that if there is an accident there may be recovery even though the disability might not have resulted had there not been an already existing disease. And it means too that if there is no right to recovery for an occupational disease, there must be an accident, `an unexpected or unforseen event * * * producing at the time objective symptoms of an injury.'"
In the Cannella case the question was whether lead poisoning produced from absorption of paint fumes was an occupational disease or accidental injury. The court therein reviewed the definitions of occupational disease adopted by courts of other jurisdictions and noted that in every instance emphasis was upon protracted and gradual development of the particular condition, disease, or difficulty. The court, moreover, distinguished between chronic lead poisoning and acute lead poisoning holding the former to be an occupational disease and the latter to constitute accidental injury. It was further pointed out in the Cannella case, supra, that the employee in question was apparently healthy until he became ill on a certain day exhibiting all the symptoms of lead poisoning. The court therein considered the sudden and unexpected development of symptoms to result from accidental causation.
We note that in Cutno v. Neeb Kearney & Company, 237 La. 828, 112 So.2d 628, the Supreme Court found that the weight of the medical testimony therein established that the strain of heavy work can cause or hasten perforation of a duodenal ulcer. Without further evidence of causation, the court then inferred that the arduousness of plaintiff's occupation caused or hastened plaintiff's difficulty. In the Cutno case plaintiff had suffered abdominal pains for approximately five years when, one morning, while working as a freight handler, he began to experience stomach pains of such intensity he was required to sit down for a while. Later plaintiff drove home and was eventually removed to a hospital where he was subjected to surgery. In substance the court held, in the Cutno case, that perforation of a duodenal ulcer caused or hastened by arduous labor constituted an accident irrespective of whether the perforation *719 occurred while the employee was actually engaged in such work or subsequently after the employee went home. The court therein further stated that although the Court of Appeal had laid considerable stress on the question of where the perforation occurred, the issue was not relevant and in support of its position the Supreme Court cited Dortch v. Louisiana Central Lumber Co., La.App., 30 So.2d 792, which held that the accident began when the employee first experienced pain.
In the case at bar the evidence discloses that plaintiff previously withstood the acoustical traumas incident to this particular phase of his work with only temporary impairment of hearing and ringing in his ears. On the day in question there can be little doubt but that the noise was louder than usual because of failure to reduce the temperature in the Number Five Kiln. There is likewise no room for doubt but that plaintiff experienced pain of such intensity that he jumped away from the kiln two or three times. Plaintiff's display of symptoms was immediately manifest. A further distinguishing feature in the present case is that not only was the pain and discomfort greater than normal but also that the symptoms did not disappear as expected by plaintiff and his foreman, Earhart.
The operation of shooting the kilns was not a daily undertaking and neither were the same employees always assigned the task of removing clinkers. Plaintiff had been employed by defendant from March 14, 1956 to October 25, 1959, on which latter date plaintiff was terminated due to a reduction in force. On July 12, 1960 (almost 9 months following plaintiff's termination), plaintiff was recalled to work and sixteen days thereafter, namely, on July 28, 1960, the incident in question transpired. The record does not reveal how many times plaintiff was engaged in shooting the kilns during the 16 day period intervening between plaintiff's reemployment and the occurrence of the alleged accident. It is clear, however, that prior to July 12, 1960, plaintiff was free from exposure to industrial noises for a period of approximately 9 months. From the foregoing it would appear most unlikely that plaintiff's condition resulted from gradual and protracted exposure to noise but that rather it was occasioned suddenly and unexpectedly as a result of his exposure to noise of excessive and unusual intensity on a specific date, namely, July 28, 1960.
We hold, therefore, that the impairment of plaintiff's hearing resulted from an "accident" within the meaning of the term as employed in our workmen's compensation statute.
Learned counsel for plaintiff forcefully argues that plaintiff should be categorized as a semi-skilled worker and, as such, entitled to compensation for a maximum of 400 weeks. In this respect esteemed counsel relies principally upon the rule established in Glidden v. Alexandria Concrete Company, 242 La. 626, 137 So. 2d 894, which held that a semi-skilled laborer (a truck driver) was entitled to compensation for total permanent disability when he was no longer able to perform the duties of his semi-skilled calling.
It hardly need be stated that an employee claiming to be a semi-skilled worker bears the burden of establishing the alleged fact. In the instant case the evidence shows plaintiff was engaged as a general helper whose duties required that he work throughout defendant's plant performing what appears to be common labor. During plaintiff's employment of approximately four and one-half years (excluding the nine months period during which he was laid off) plaintiff served as assistant kiln burner, truck driver, payloader operator, belt man, raw mill helper and finished mill helper (none of which duties are explained to any degree). It does not appear that any particular skill, training, instruction or preparation is necessary for the efficient performance of any such duties. It is *720 equally clear that plaintiff's duties were not limited or restricted to regularly assigned work involving special training or instruction or the application of special skill or dexterity but rather that, at the option and discretion of his immediate superiors, plaintiff was subject to being assigned any task in any part of the plant as conditions might require.
We shall now consider defendant's second and alternative contention, namely, that plaintiff did not sustain total permanent disability but merely impairment of a physical function entitling plaintiff only to compensation for a period of 100 weeks pursuant to the provisions of LSA-R.S. 23:1221 (4) (p).
As herein previously shown, plaintiff was not a semi-skilled laborer as contended by esteemed counsel for plaintiff but only a common laborer. Following his injury, plaintiff lost not a single day's work until he was terminated by defendant five months later due to a reduction in force. From the time of the accident until his aforesaid discharge plaintiff was employed in those areas of defendant's plant removed from the kilns. During this period of employment defendant lodged no further complaints with respect to his hearing. This present claim for compensation was not filed until eleven months after the accident. For the duration of plaintiff's employment by defendant following the accident (a period of five months) plaintiff performed all duties demanded of him which were identically the same as before the accident excepting only that he was no longer required to work in areas of high noise intensity. Plaintiff conceded, however, that in all sections of the plant there was noise to some degree.
Following his termination by defendant, plaintiff applied for unemployment benefits which necessitated his signing an affidavit to the effect that he was available for and able to work. Plaintiff freely testified that he would accept any employment offered provided it did not involve working in areas of high intensity noises. He further conceded that since his discharge he had occasionally performed odd jobs and that at the time of trial he was unemployed because of the unavailability of work rather than because of disability.
Able counsel for plaintiff strenuously urges that plaintiff should be awarded compensation for total permanent disability under the rule established by Blanchard v. Pittsburgh-Des Moines Steel Co., La.App., 59 So.2d 384; Lathers v. Schuylkill Products Co., La.App., 111 So.2d 530, and Olivier v. Liberty Mutual Insurance Company, 241 La. 745, 131 So.2d 50, namely, that where a common laborer sustains injury seriously handicapping him from competing with others in the common labor market, he is considered totally and permanently disabled.
In cases of this nature, the test applied to a common laborer is whether the injured employee can no longer substantially compete for regular employment with able-bodied workers in the flexible market for common labor. Blanchard v. Pittsburgh-De Moines Steel Co., supra. A common laborer whose injury prevents his engaging in one or two, or even a few particular kinds of common labor, but who nevertheless can perform other kinds of common labor is deemed capable of substantial competition in the regular common labor market and is, therefore, not totally and permanently disabled. Lathers v. Schuylkill Products Co., La.App., 111 So. 2d 530; Olivier v. Liberty Mutual Insurance Company, 241 La. 745, 131 So.2d 50.
Following his injury, plaintiff remained in defendant's employ and continued to successfully and satisfactorily perform all his former duties save and excepting only one phase thereof. He continued to perform virtually all of his former duties in the presence of industrial noises. Although admittedly, plaintiff is unable to work in areas of high noise intensity, his *721 continued ability to work in industry in general is amply demonstrated by the record. His ability to successfully compete in the general common labor market is further established by his continued employment with defendant following the accident. In addition the record is barren of proof that plaintiff has been denied employment because of his hearing impairment. Moreover, plaintiff's own testimony shows that he would readily accept any industrial employment which does not require his exposure to unusually loud noises.
Finally, impairment of hearing has been held to be a type of functional impairment contemplated by LSA-R.S. 23:1221(4) (p). In Francois v. Circle Drilling Company, Inc., La.App., 112 So.2d 771, we held that an accident producing a 37% loss of hearing in one ear and a 15% loss in the other and which caused the employee to experience a ringing and humming sound in his ear, but which did not disable him from performing his former duties of oil drilling roughneck, was a proper case for application of LSA-R.S. 23:1221(4) (p).
For the reasons hereinabove set forth, the judgment of the trial court in favor of plaintiff and against defendant decreeing plaintiff entitled to compensation at the rate of $35.00 weekly for 400 weeks is amended and judgment rendered herein in favor of plaintiff, Valentino J. Comoletti, and against defendant, Ideal Cement Company, for workmen's compensation at the rate of $35.00 weekly for 100 weeks commencing July 28, 1960, together with interest on each past due installment at the rate of Five (5%) per cent per annum from due date, until paid, subject to credit for all compensation paid to November 9, 1960, and all costs of this proceeding.
It is further ordered, adjudged and decreed that except as insofar as the same is hereby amended, the judgment of the trial court is affirmed.
Amended and affirmed.