This is a compensation suit, the plaintiff seeking an award for total and permanent disability under Subsection 1 (b), Section 8 of Act 20 of 1914, as amended by Act 242 of 1928.
Plaintiff alleged that on or about the 18th day of July, 1941, he was employed by W. Murray Werner, engaged as a carpenter on a building unit located near Barksdale Field, Louisiana; that while engaged in the work of a carpenter, a number of foreign particles lodged in his left eye which caused an infection or inflammation in his left eye, nose, throat and burned the mucous membranes of his eye, nose and throat, which condition caused him to become totally and permanently disabled.
The Fidelity Casualty Company of New York was made a party defendant, having issued to its codefendant, Werner, a policy and contract of workmen's compensation insurance.
The answer of defendant admitted all the averments of plaintiff's petition with the exception of the accident and resulting disability. Accordingly, two factual issues are presented for the court's determination: (a) Did the plaintiff sustain an accident within the meaning and import of the act and the judicial interpretations thereof; and (b) did this accident result in total and permanent disability to the plaintiff so as to entitle him to the maximum award during a period not exceeding 400 weeks.
A trial of the case resulted in an award in favor of plaintiff and against the defendants in solido in the sum of $20 per week, during the period of disability, not exceeding 400 weeks, interest and cost. There was further judgment in favor of plaintiff and against defendants for the sum of $250 for medical expenses. The defendants perfected both a devolutive and suspensive appeal from this judgment.
Plaintiff has followed the trade of a carpenter for about forty years and at the time of the alleged accident was seventy-three years of age. On May 19, 1941, he was employed by defendant Werner to do carpentry work on a residential unit near Barksdale Field, which project was emergency construction and to be completed within about one-fourth of the time ordinarily required for such construction. On or about the 18th of July, the carpenters caught up with the scrubbers or painters who were doing the finishing work on the walls and were required to work in the same rooms with them until the work was completed on the 23d of July.
The proper finishing of the walls consisted of several operations, to-wit; application of sheet rock, then the wall board joints formed by the sheet rock were treated with a plastic material, referred to as a cement or textone. On top of the textone a fiber tape about 1 3/4 inches wide was spread on which another coat of textone was applied. When this had dried it was made smooth by the use of coarse sandpaper by the painters. The scrubbing of the walls with sandpaper to make the surface even and smooth caused the room to be filled with dust and small particles of the textone or cement. The condition of the atmosphere in the rooms where these operations were going on was described by witnesses as like a "dense fog".
After plaintiff had been working under these conditions for two days, his left eye and the left side of his head began to pain him. He did not work for the next two days, which were Saturday and Sunday, but his left eye continued to pain him. Plaintiff applied an electric pad to it and used some kind of drops for the eye, one or both of which gave him considerable relief and when he returned to work on Monday, his eye was much better. On Monday afternoon, plaintiff testified he got a lot of the dust in his eye and that he rubbed his eye, which aggravated the pain. The next day, although he worked, his eye became more painful. He testified that it felt like there was some trash in his eye and that when he rubbed it in an effort to get the trash out, his eye became more painful.
Plaintiff was laid off on Wednesday, July 23d, and during the remainder of that week, his eye gradually got worse and on the following Monday, July 28th, he called in his family physician who, after examining him, took him to the Tri-State Hospital and placed him in charge of the eye specialist in that institution. After remaining in the hospital for two weeks, plaintiff returned *Page 257 
home. He soon suffered a relapse and was returned to the hospital where he remained another two weeks under the attention of the eye specialist. During this time plaintiff's eye was inflamed and extremely painful. He testified that it felt like something "jabbing" in his eye.
Several months subsequent to the date of the alleged accident plaintiff attempted to do carpentry work. He was able to do fairly well when working on the outside but when working on the inside of the house, he was unable to see and could not do the finishing work properly. The foreman on the job detected that plaintiff could not do the work and complained about it, after which he gave up his job.
The testimony makes it clear to our minds that at the time of trial plaintiff's eyesight was such as to unfit him for following his trade as a carpenter.
Prior to the time he worked in the dustfilled room for defendant, plaintiff was able to carry on his trade successfully and to the satisfaction of his employers. He used glasses to read and it is shown that his eyesight was not normal, but the strange thing is that his greatest trouble before that time was in the right eye. The eye he claims was injured was the better eye of the two. It is shown that plaintiff had a chronic sinus trouble for which he was treated several years before. But the record makes it clear he had not for sometime before the date of the alleged injury been bothered with that trouble or any other disease, such as a cold, tonsilitis, or catarrh, etc. While plaintiff was in the hospital he developed a breaking out in and on the eye and head, commonly known as "Shingles", medically defined as "Herpes Zoster".
Defendants contend that this condition was not caused by the dust but from other infection, such as infected sinus, and that the chemical content of textone will not cause Herpes Zoster, although it is shown that the medical profession recognizes as a fact that Herpes Zoster is caused principally by three things, viz., infection, traumatism and chemical burns or poison. It is likewise shown that those three things are the exciting causes, but the exact cause of Herpes is unknown. Most authorities tell one it is a virus and the medical profession does not know what virus is. One medical man said it was like a body endowed with life. Also that an injury or abrasion might allow it to enter and begin its work. We frankly admit that for us to base our opinion and decision upon a medical theory the medical men are not certain of themselves would be dangerous.
Plaintiff's family physician, who is a reputable doctor, was certain in his own mind that the cause of plaintiff's eye trouble was the particles of dust that got in his eye and a recognized eye specialist, who examined plaintiff, was likewise sure in his own mind that plaintiff's trouble was caused by the dust. The eye specialist at the Tri-State felt sure when first seeing plaintiff that the dust was the cause of his trouble but wavered in his opinion after he developed Herpes Zoster. At the time of trial he was not willing to express an opinion that it was the sole cause or that it was not.
We are convinced that plaintiff has met the burden of proving that the condition of his left eye was caused by the dust which settled in it while he was in the course and scope of his employment.
Defendants urge that the fact that the other employees who worked under the same conditions were not similarly affected shows that plaintiff's trouble could not have been caused by the dust, and further, that since his left eye was affected and not both, plaintiff's theory is excluded. The first of these contentions might have some force if it were shown that the other employees' eyes were of the same strength or weakness as plaintiff's or if the other evidence did not make it certain that the dust caused the injury to plaintiff's eye.
The record makes it clear that the painters and scrubbers used goggles and masks to prevent harm from the dust and it also shows that one carpenter refused to work in the room because of the great amount of dust. The medical testimony shows it to be not unusual for one eye to become affected without both being involved. It depends entirely upon the power of resistance in each eye or that more or larger particles of dust got into one eye than did the other.
Lastly, defendants contend there was no accident within the intendment of the Workmen's Compensation Act of this State and if the dust was the cause of plaintiff's eye trouble, that it was an occupational disease and to be expected to happen to one working in dust as was plaintiff.
To begin with, we feel sure from all the medical testimony that Herpes Zoster cannot be classed as an occupational disease. Occupational disease has been defined as *Page 258 
one wherein the cumulative effect of the employee's continued absorption of deleterious substances from his environment ultimately results in manifest pathology. In occupational disease any one exposure is inconsequential in itself, but the continued absorption is the factor which brings on the disease. It has also been defined as happening drop by drop, little by little, day after day, for weeks and months, and finally enough is accumulated to produce symptoms. It has its inception in the occupation and develops over a long period of time from the nature of the occupation.
We think it clear that an occupational disease is not one that develops within a few days after the employee is exposed to a condition. If the conditions under which he is required to work are so injurious to health as to produce symptoms which are apparent on the second day, it cannot be classed as occupational.
We must bear in mind that plaintiff had followed the trade of carpentry for forty years, and it is not shown that he ever before had to work under the conditions existing at the time of his injury. He had been in the employ of defendant for two months and had not been called upon to work under such conditions before, and had it not been for the emergency requiring quick completion of the building, he would not have been sent into this room to work until the painters had finished. Plaintiff was only required to perform work under these conditions for a period of four days and felt the injury to his eye on the second day.
To connect a disease with the occupation or trade of an employee, it must be that the exposure that brings about the disease is generally and usually present whenever and wherever he is following his occupation or trade and cannot be so considered when the exposure which might cause the disease is for a limited time on a job under conditions which are unusual for one engaged in his occupation or trade and when brought about by an emergency. Clearly the defense of occupational disease urged here is not good.
We deem it unnecessary to go into the technical medical terms to describe the condition of plaintiff's eyes at the time of trial below. It is certain, to our minds, that the vision in plaintiff's right eye is worse than the vision of the left and therefore the impaired vision of his left eye, caused by the accident, has rendered him incapable and incapacitated to follow his trade as a carpenter, and that he is entitled to compensation for total and permanent disability.
There is no error in the judgment of the lower court and it is affirmed with costs.
TALIAFERRO and HAMITER, JJ., concur.