# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## NO. 11-600

## GEORGE MCCARTHY, ET AL

## VERSUS

## ENTERGY GULF STATES, INC.

**\* \* \* \* \* \* \* \***

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO.  1999-4610
HONORABLE CLAYTON DAVIS, DISTRICT JUDGE

**\* \* \* \* \* \* \* \***

## JIMMIE C. PETERS
## JUDGE

**\* \* \* \* \* \* \* \***

Court composed of John D. Saunders, Jimmie C. Peters, and Marc T. Amy, Judges.

**AFFIRMED.**

**Wells T. Watson**
**Jeffrey T. Gaughan**
**Baggett, McCall, Burgess, Watson & Gaughan**
**3006 Country Club Road**
**Lake Charles, LA 70605**
**(337) 478-8888**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
     **George McCarthy, et al.**

**Herschel Hobson**
**Hobson & Bradley**
**2190 Harrison St.**
**Beaumont, TX 77701**
**(800) 838-6410**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
     **George McCarthy, et al.**

**Robert E. Landry**
**Kevin P. Fontenot**
**Scofield, Gerard, Singletary & Pohorelsky**
**P. O. Box 3028**
**Lake Charles, LA 70602-3028**
**(337) 433-9436**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
     **Entergy Gulf States, Inc.**

PETERS, J.

The defendant, Entergy Gulf States, Inc. (formerly Gulf States Utilities Company but hereinafter referred to as Entergy/Gulf States),[1] appeals a trial court judgment finding that two of its retired workers suffered occupational hearing losses as a result of on-the-job noise exposure over the length of their careers working for Entergy/Gulf States, and awarding the two workers monetary damages. For the following reasons, we affirm the trial court judgment in all respects.

## DISCUSSION OF THE RECORD

The two employees at issue in this litigation are Alexander Valerie, Jr. and Milton Pharr.[2] Both were employed by Entergy/Gulf States and worked at its Nelson Station facility in Westlake, Calcasieu Parish, Louisiana, during their careers. Entergy/Gulf States is a business of providing electrical services to the general public and its Nelson Station facility generates electricity. The turbines, compressors, fans, boilers, and other equipment/tools used in the Nelson Station facility's operation generates significant noise levels in the various sections of the facility.

Mr. Valerie worked for thirty-four years and retired in 1986; and Mr. Pharr worked for thirty-six years before his retirement in 1995. Both men brought this action against Entergy/Gulf States seeking to recover monetary damages for an occupational hearing loss they claim to have suffered as a result of their employment with Entergy/Gulf States. Mr. Valerie died on October 20, 2007, and thereafter his wife and children were substituted as plaintiffs in this action.

---

[1] Gulf States was merged/absorbed into Entergy in 1994.

[2] Although there are other plaintiffs and defendants in this litigation, this appeal only concerns Mr. Valerie, Mr. Pharr, and Entergy/Gulf States.

Entergy/Gulf States does not seriously contest the fact that each individual plaintiff sustained a hearing loss during his years of employment. Instead, in both its answer and other pleadings filed in response to the plaintiffs' petition, Entergy/Gulf States asserted a number of defenses including: (1) that any hearing loss suffered by either plaintiff was not related to his employment situation; (2) that their claims had prescribed; and (3) that their exclusive remedy for any occupational hearing loss was to be found in the Louisiana Workers' Compensation Act.

Following a three-day bench trial, the trial court took the issues under advisement. In its written reasons for judgment, the trial court concluded that the plaintiffs had suffered a hearing loss caused by exposure to loud noise while working at the Nelson Station facility; that their claims had not prescribed based on the application of the doctrine of *contra non valentem*; and that because the hearing losses sustained by the plaintiffs were gradual in nature, their remedy was in tort and not under the Louisiana Workers' Compensation Act. The trial court awarded Mr. Valerie's wife and children a total of $50,000.00 in general damages and awarded Mr. Pharr $50,000.00 in general damages and $28,517.56 in present and future medical damages.

After the trial court reduced its written reasons to judgment form, Entergy/Gulf States perfected this appeal, raising six assignments of error:

1. The district court committed manifest error in concluding that the exceptional and strictly construed doctrine of *contra non valentem* should be applied to these facially prescribed claims.

2. The district court committed manifest error in finding that plaintiffs met their burden of proving causation.

3. The district court committed legal error in determining that the plaintiffs' claims for occupational hearing loss were not barred by the exclusivity provision of the Louisiana Workers' Compensation Act.

2

4.     The district court committed legal error in failing to apply contributory negligence principles to plaintiffs' claims and in failing to further determine that plaintiffs' contributory negligence barred any recovery in this case.

5.     The district court abused its discretion in awarding $50,000 in general damages to a plaintiff whose own testimony confirmed that he had sustained no damages.

6.     The district court erred in awarding costs to plaintiffs because plaintiffs' claims should have been denied for the reasons cited above and thus costs should be awarded to defendant/appellant.

**OPINION**

*Scope of Review*

The scope of review of factual findings of the trial court is well settled.

[A] court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. . . . Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. In applying the manifestly erroneous—clearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues *de novo*.

*Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989) (citations and footnote omitted).

The manifest error/clearly wrong standard also applies to the trial court's factual findings when the testimony of expert witnesses differ. *Sistler v. Liberty Mut. Ins. Co.*, 558 So.2d 1106 (La.1990).

We review an award of damages under the abuse of discretion standard, and in doing so, we must recognize that "the discretion vested in the trier of fact is great,' and even vast." *Youn v. Maritime Overseas Corp.*, 623 So2d 1257, 1261 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994). That being the case, "an appellate court should rarely disturb an award of general damages." *Id.*

3

### *Factual Background*

Much of the factual background in this litigation is not in dispute. Specifically, there is no dispute as to the fact that both Mr. Valerie and Mr. Pharr sustained a hearing loss between the time they went to work with Entergy/Gulf States and their retirement. Additionally, it is undisputed that aspects of the work environment at the Nelson Station facility generate noise levels which exceed the safety limits for an unprotected employee.

The record also establishes that when Mr. Valerie and Mr. Pharr went to work for Entergy/Gulf States, the issues of industrial noise and employee hearing loss were not even points of discussion within the employer/employee relationship at the Nelson Station facility. Despite the fact that industrial employers had been well aware of the connection between employee hearing loss and industrial noise since the 1950s, it was not until the implementation of the Occupational Safety and Health Administration (OSHA) standards and directives in the early 1970s, that employers, including Entergy/Gulf States, expressed any public recognition of the problem.

The OSHA standards and directives required that industries monitor the workplace to assess noise exposures and, if the noise levels exceeded safe levels, to implement steps to protect individual workers. These steps included mandating the wearing of protective head gear under certain conditions. At the same time OSHA's regulations were being promulgated, 29 C.F.R. 1910.95 (1971) came into effect. This regulation required employers to provide a continuing, effective hearing conservation program to those employees exposed to noise levels exceeding the permissible noise exposures.[3] The evidentiary record establishes

---

[3]The maximum levels were 90 dBA for 8 hours; 92 dBA for 6 hours; 95 dBA for four hours; 97 dBA for three hours; and 100 dBA for two hours. "dBA" is the abbreviated form of A-

4

that Entergy/Gulf States initially responded to the OSHA directives by doing nothing more than providing sponge earplugs for its workers at the Nelson Station facility and that initially it did nothing to respond to the hearing conservation program requirement.

The first effort toward noise evaluation and control at the Nelson Station facility came in the early 1980s, when Entergy/Gulf States caused one of its employees to divide the plant into a grid, take noise level readings within the grids, and to place warning signs in areas of excessive noise.[4] Entergy/Gulf States provided the employee responsible for this task with a single dosimeter,[5] a noise meter, and a decibel meter. After the employee completed this task, spot checks were performed from time to time to determine if noise levels had changed in a given area. The initial survey was required by OSHA directives. Given the fact that the employee assigned to survey the entire plant was provided with only one dosimeter, it was never used to determine the noise exposure any individual employee encountered. Thus, the testing performed was more of a gross or general nature rather than specific, thereby precluding Entergy/Gulf States from using the data to extrapolate the effect on an individual employee.

Although Entergy/Gulf States required the facility survey, it did not begin thereafter to provide any educational training for its employees or to promulgate any mandatory requirements with regard to the wearing of protective gear. Even

weighted decibels. This is obtained by attaching a filter to a sound pressure level meter to filter out low pitch sounds in an approximation of the frequency response of the human ear.

[4]While there is some disagreement over the safe noise level, most of those who testified on the point suggested that OSHA regulations required that a worker not be exposed to greater than 85 decibels for more than fifty percent of their work time without being offered ear protection.

[5]A dosimeter is a mechanism which can be attached to an individual and summarizes records of the amount of sound that an individual is exposed to over a period of time. It then summarizes the readings generated by the exposure and assigns a single number value which represents the average exposure in decibels over the period of time it is attached to the individual.

after Entergy/Gulf States revised its Safety Manual in the early 1980s, to include information pertaining to noise and the use of hearing protection, the language was without enforcement provisions. At some point after 1980, Entergy/Gulf States made various types of hearing protection devices available to its employees, and sometime thereafter, the department heads were required to provide a yearly refresher course to the employees. Additionally, in the mid-1980s Entergy/Gulf States began administering audiograms to its employees.

By 1986, Entergy/Gulf States was using engineering techniques to control the noise levels in certain portions of its Nelson Station facility. These included the use of insulation and mufflers, isolation of certain equipment which emitted excess noise levels, the building of walls, and even shutting down equipment where safe noise levels could not be accomplished. Where remedial measures did not work and the equipment could not be shut down, company officials would then conduct a job hazard analysis which included a study of the length of time an employee might remain in a certain noise level environment. Based on the findings derived from the analysis, hearing protection might be required of the exposed employee.

On June 9, 1994, Entergy/Gulf States conducted its first plant sound level survey and repeated it in July of 1995. Thereafter, it performed two such surveys in 1997, one on June 4, and a second on June 23.[6] The purpose of these surveys was to identify those workers who were being exposed to 85 decibels for fifty percent of his or her work day and cause those workers to be included in a hearing conservation program.

In summary, Mr. Valerie had already worked at the Nelson Station facility for approximately twenty-eight years and was within six years of retirement when

---

[6]The record does contain information concerning subsequent surveys.

Entergy/Gulf States began any programs addressing excessive noise levels at the Nelson Station facility. While Mr. Pharr would work fourteen more years before retiring, he had worked approximately twenty-two years at the Nelson Station facility before 1980.

## *ENTERGY/GULF STATES' FIRST ASSIGNMENT OF ERROR*

In its first assignment of error, Entergy/Gulf States argues that the trial court erred in finding that the doctrine of *contra non valentem* prevented prescription from running against the plaintiffs, and in not finding that the plaintiffs' claims against Entergy/Gulf States had prescribed.

The doctrine of *contra non valentem* was discussed by this court in *Picard v. Vermilion Parish School Board*, 00-1222, pp. 3-5 (La.App. 3 Cir. 4/4/01), 783 So.2d 590, 594-95, *writ denied*, 01-1346 (La. 6/22/01), 794 So.2d 794:

> [The plaintiffs] admit that they filed their action after the prescriptive period but argue that the general rules of prescription do not apply to their claims because they were effectively barred from enforcing their rights for reasons beyond their own will. This is known as the suspensive theory of *contra non valentem agere nulla currit praescripto*, or " 'prescription does not run against a party unable to act.' " *Wimberly v. Gatch*, 93-2361, p. 4 (La.4/11/94); 635 So.2d 206, 211. According to this theory, prescription does not begin to run until "a plaintiff either knew or should have known of a cause of action, even if that knowledge does not occur until long after the wrongful conduct at issue has occurred." *Simmons v. Templeton*, 97-2349, 98-43, p. 4 (La.App. 4 Cir. 11/10/98), 723 So.2d 1009, 1012, *writs denied*, 98-3050, 98-3060 (La.2/5/99); 738 So.2d 4, 738 So.2d 5. Louisiana jurisprudence considers *contra non valentem* to be "an exceptional remedy . . . in direct contradiction to the articles in the Civil Code" which must be "strictly construed." *Harsh v. Calogero*, 615 So.2d 420, 422 (La.App. 4 Cir.1993).
>
> Under Louisiana law, the doctrine of *contra non valentem* halts the running of prescription when the circumstances of the case fall into one of the following four categories:
>
> > (1) when courts are legally closed; (2) when administrative or contractual restraints delay the plaintiff's action; (3) when the defendant prevents the plaintiff from bringing suit; and (4) when the plaintiff

> does not know nor reasonably should know of the cause
> of action.

> *In re Med. Review Panel Proceeding Vaidyanathan*, 98-0289
> (La.App. 4 Cir. 9/23/98); 719 So.2d 604, 607, *writ denied*, 98-2674
> (La.12/18/98); 732 So.2d 1238; *Chaney v. State Through the
> Department of Health and Human Resources*, 432 So.2d 256, 258-59
> (La.1983). Although *contra non valentem* is a legal principle, its
> application to the facts of the case and a determination of whether or
> not the Plaintiffs were indeed prevented from filing their claim under
> one of the four circumstances is an issue of fact. Therefore the trial
> court's finding of fact on this issue is subject to the manifest error,
> clearly wrong standard of review. *See Rosell v. ESCO*, 549 So.2d 840
> (La.1989).
>
>             . . . .
>
> The principles of *contra non valentem* do not halt the running
> of prescription "if the plaintiff's ignorance is the result of his own
> willfulness or neglect." *Matthews v. Sun Exploration & Prod. Co.*,
> 521 So.2d 1192, 1197 (La.App. 2 Cir.1988). That is, the plaintiff will
> be deemed to know what he could by "reasonable diligence" have
> learned. *Id*. Prescription runs from the time that the plaintiff has
> actual or constructive knowledge of the act, which has been defined as
> "the time at which the plaintiff has information sufficient to excite
> attention and prompt further inquiry." *National Council on
> Compensation Ins. v. Quixx Temporary Serv., Inc.*, 95-725, p. 7
> (La.App. 4 Cir. 11/16/95), 665 So.2d 120, 124. Prescription does not
> begin to run at the first indication that the plaintiff may have suffered
> harm, but rather it begins to run "when plaintiff has reasonable basis
> to pursue claim against specific defendant." *Jordan v. Employee
> Transfer Corp.*, 509 So.2d 420, 424 (La.1987). The heart of the
> inquiry into constructive knowledge is the reasonableness of plaintiff's
> inaction. *Id.*

### Background Concerning Mr. Valerie

The primary source of information concerning Mr. Valerie's personal history was derived at trial from his October 7, 2003 deposition and the testimony of his widow and daughter.

Mr. Valerie testified that he had a fourth grade education, but was able to read and write. He served in the United States Army Quartermaster Corp during World War II. For eleven months of his two-year tour of duty, Mr. Valerie was stationed in the United States. He spent his remaining thirteen months in the Philippines. He saw no combat action during his service.

8

Mr. Valerie worked for Entergy/Gulf States from 1952 through 1986. He spent the first twenty years as a laborer[7] and the last fourteen as an operator. According to Mr. Valerie, he only became aware he had suffered a hearing loss after undergoing an audiogram arranged by his attorney on April 9, 1999. Prior to that time, he noticed no problems with his hearing and had never sought medical evaluation or treatment for a hearing loss. He stated that he was surprised when he learned of the hearing loss and, although the audiologist who performed the April 9, 1999 testing procedure did not give him a reason for the results, he believes it to be noise related.

With regard to his employment situation, Mr. Valerie testified that somewhere between sixteen and twenty years after he began his employment, Entergy/Gulf States started providing earplugs, but it was not until around 1980, that wearing the hearing protection became mandatory in the noisier areas of the Nelson Station plant. During the last six years of his employment, Entergy/Gulf States began to strictly enforce the wearing of hearing protection in noisy areas. However, even after hearing protection became mandatory, no Entergy/Gulf States official ever instructed its employees concerning when, where, and why they should wear such hearing protection.[8] Even after Entergy/Gulf States required him to submit to hearing tests performed on site at the Nelson Station facility, Mr. Valerie was never provided with the testing results.

Marjorie Valerie, Mr. Valerie's wife, had a different recollection of her husband's hearing problems. She testified that she began noticing her husband's hearing difficulties in the early 1970s, when he became an operator for

---

[7]Prior to 1970, laborers at the Nelson Station facility were required to clean the turbines which, in a closed environment, often produced noise levels between 90 and 100 decibels.

[8]Mr. Valerie recalled attending a company sponsored workshop on hearing protection at work. However, he testified that the workshop discussion centered on the types of ear plugs available and not the necessity thereof.

Entergy/Gulf States. According to Mrs. Valerie, her husband would often not respond to her direct comments, and when this was brought to his attention, he would simply say that he did not hear her. The situation became so severe that she suggested he seek medical help for his hearing problems. She testified that she was unaware that Entergy/Gulf States had performed hearing tests on its employees and that she never saw any test results for her husband.

Patsy Bellard, Mr. Valerie's daughter, testified that she was in high school in the late 1960s and early 1970s when she first noticed that her father was having difficulty hearing. According to Ms. Bellard, her father would turn the volume on the television extremely loud; would answer the telephone in an extraordinary loud voice; could not hear a conversation if he was not directly facing the speaker; and would often answer a question inappropriately because he did not hear the question clearly.

Entergy/Gulf States' records indicate that Mr. Valerie underwent audiograms on February 24, 1984, and February 1, 1985. In an April 27, 1984 letter, Dr. H. M. Hennington, Entergy/Gulf States' corporate medical consultant, informed Mr. Valerie that the 1984 test results revealed significant hearing loss with wax build up in both ears. He suggested to Mr. Valerie that he have his ears cleared of wax and repeat the audiogram. The 1985 audiogram results revealed that even without the wax buildup, Mr. Valerie had suffered a hearing loss in both ears. Dr. Hennington confirmed this finding to Mr. Valerie in a March 30, 1985 letter. The letter also noted that this finding would be addressed by Entergy/Gulf States' Corporate Occupational Health and Safety group (COHS group), and that he would be notified if any further action was required. Mr. Valerie testified that he heard nothing else from either Dr. Hennington or the COHS group.

*Background Concerning Mr. Pharr*

Mr. Pharr served in the United States Marine Corp from 1957 to 1958. During that two year period he served as a jet-engine-mechanic crew chief and worked on a flight line. At all times, his superiors required that he wear hearing protection.

His career with Entergy/Gulf States began in December of 1959, when he was hired as an operator at the Nelson Station facility. He maintained that position for twenty years before switching to a mechanic position. Three years later, Entergy/Gulf States promoted him to the position of mechanic foreman, and two years thereafter, to the position of mechanical maintenance planner in the planning department. He was still holding this latter position when he retired in 1995. His initial position as operator caused him to work outside a significant amount of time, learning the particulars of the plant's operation. This outside activity, however, did not insulate him from the plant's noise, it simply caused him to be exposed to a different form of noise. Once he was promoted to the position of mechanic, he performed most of his duties inside a facility building, but regardless of his employment position, he was constantly exposed to noise generated by the equipment in the facility.

According to Mr. Pharr, Entergy/Gulf States never provided him hearing protection during the twenty years he worked as an operator. Additionally, when he assumed the mechanic position in 1979, foam earplugs were available in the storeroom but no one ever explained to him why or where they were to be worn or the correct way to use them. He further testified that he did not recall seeing any signs warning that hearing protection was required in the plant, although he did recall decibel signs being installed in certain areas of the plant. Mr. Pharr did acknowledge that at some point prior to 1995, Entergy/Gulf States instituted a

policy requiring its employees to wear hearing protection in noisy areas although he did not recall attending any meeting addressing where and how to wear the earplugs that had been made available.

Mr. Pharr acknowledged that Entergy/Gulf States started performing on-the-job hearing tests on the employees at some point during his career and that the test results were available at company safety meetings. However, he also testified that no one from the company explained to him that he had suffered a hearing loss and that he needed to see a specialist. He acknowledged that he did receive the results of hearing tests performed between December 31, 1987, and February 23, 1989, and that these results revealed that he had suffered a mild hearing loss in both ears. However, he did not make the connection between the hearing loss and his work around the plant generated noises—although he was aware of the connection between exposure to loud noise and damage to an individual's hearing.

Earline Pharr, Mr. Pharr's wife, testified that she and Mr. Pharr started dating in 1985, and that they married in 1995. When they first started dating, Mr. Pharr would often be nonresponsive to comments and she initially thought he was ignoring her. However, she soon realized that his lack of response was due to his failure to hear. It came to a point in their relationship that he began to rely on her for assistance in understanding the verbal interaction taking place in noisy gatherings.

Entergy/Gulf States' records reflect that at least seven hearing tests were administered to Mr. Pharr at various times late in his career. These included tests administered on February 14, 1984; January 28, 1985; January 16, 1986; July 22, 1987; November 10, 1988; January 22, 1990; and March 13, 1992. Beginning with the July 22, 1987 test, audiograms revealed a hearing loss in the higher frequencies

in both of Mr. Pharr's ears. Mr. Pharr acknowledged that he retained copies of these tests.

***Trial Court's Analysis***

In finding that exceptional circumstances existed such that *contra non valentem* applied to the plaintiffs' claims, the trial court noted Entergy/Gulf States' superior position in relation to the relative unsophistication of the plaintiffs. It found the evidentiary record replete with evidence to the effect that Entergy/Gulf States never informed its workers that extended exposure to the noise levels at the Nelson Station facility would, and probably had, caused them occupational hearing losses prior to the commencement of hearing tests in 1984. The trial court stated that "[t]he employer's failure to so communicate to its workers over the years is both evidence of its negligence towards its employees and justification for the application of the doctrine of *contra non valentem*."

After reviewing the record, we find no error in the trial court's application of *contra non valentem* in light of the facts at issue. A review of the results of the hearing tests performed on Mr. Valerie and Mr. Pharr reveal that while some of the test results indicate that the plaintiffs suffered some form of hearing loss, the reports make no mention of causation. Additionally, the test results would be confusing to an unsophisticated layperson in that they consist mainly of seemingly unrelated numbers.

We find no error in the trial court's conclusion that prescription was not tolled on Mr. Valerie's and Mr. Pharr's claims against Entergy/Gulf States at the time suit was filed on July 13, 1999.

## CAUSATION

In its second assignment of error, Entergy/Gulf States argues that the trial court erred in finding that plaintiffs met their burden of proving they suffered a

13

hearing loss as a result of the noise levels associated with their employment. The record contains the testimony of a number of witnesses on this issue, including five who provided the trial court with expert opinions: Robert Bruce, a Houston, Texas acoustical engineer and expert in the field of engineering aspects of hearing conservation programs; Dr. David M. Lipscomb, a consulting audiologist from Stamwood, Washington; Dr. Michael Seidemann, a Kenner, Louisiana audiologist and expert in the field of industrial and forensic audiology; Dr. Ross J. Roeser, a Dallas, Texas audiologist; and Jerry Lauderdale, an Austin, Texas expert in industrial hygiene.

Entergy/Gulf States' principal complaint is that the trial court erred in relying on Mr. Bruce's opinion because he failed to calculate the duration of the plaintiffs' noise exposure and instead compiled a summary of noise levels the plaintiffs would have been exposed to over the term of their employment with Entergy/Gulf States. Entergy/Gulf States claims that this summary is inaccurate as it is not based on the plaintiffs' actual time adjacent to noise sources, and it omits all noise levels below eighty-five decibels. Entergy/Gulf States further asserts that Dr. Lipscomb's use of this data in formulating his opinion caused his opinion to be unreliable.

Mr. Bruce testified that in his expert opinion, Mr. Valerie and Mr. Pharr were constantly exposed to noise levels between 85 and 105 Hz[9] in the years before Entergy/Gulf States made the wearing of hearing protection mandatory in high noise areas of the Nelson Station facility. Additionally, he expressed the opinion that the time the two men were subjected to these levels was sufficient to cause their hearing impairments. He asserted that Entergy/Gulf States' failure to provide hearing protection to its employees and its failure to properly educate and

---

[9] Hz stands for Hertz, which is the equivalent of cycles per second.

14

train its employees in the importance and proper use of these protective devices was a cause of the plaintiffs' hearing losses.

Mr. Bruce based his opinions on a personal inspection of the Nelson Station facility, a review of the sound surveys performed by Entergy/Gulf States at the Nelson Station facility in the 1990s and 2000s, published literature, the location of the individual plaintiffs' various jobs, the sound levels generated at each location they worked, and his own experience in the industry. The one thing Mr. Bruce did not do in reaching his conclusions was to conduct any individual dosimeter tests. He explained that because a dosimeter reading is a single number which represents a time–weighted average over the entire day instead of a specific reading at a given point in the day, he discounted the idea that a few days of sound measurements and dosimeter readings would be sufficient to characterize an individual's exposure to noise over a career. While he did acknowledge that dosimeter tests over a significant time period would have been helpful, he also noted that Entergy/Gulf States had no such studies prior to the early 1980s.

Mr. Bruce testified that instead of dosimeter readings on the individual plaintiffs, he compiled sound work exposures and sound levels for each plaintiff based on the results of Entergy/Gulf States' own later sound surveys of the Nelson Station facility. Because he had no reason to believe that the Nelson Station facility generated any less noise prior to 1995, Mr. Bruce had no problem in accepting the results of Entergy/Gulf States' sound surveys and in applying these results to the plaintiffs' past exposure. All of that information, together with the audiogram results, pointed to the conclusion that the plaintiffs were exposed to excessive noise at the Nelson Station throughout their work career sufficient to cause their hearing loss.

15

Dr. Lipscomb agreed with Mr. Bruce's evaluation completely. He visited the Nelson Station facility in November 2003, and reviewed four sound level surveys[10] before also reaching the conclusion that the noise levels at the facility were sufficient to produce noise-induced hearing loss in Mr. Valerie and Mr. Pharr, or most any employee, working under the same conditions without protective gear. He also noted that because Entergy/Gulf States did not start providing hearing protection for its employees until the 1970s, and did not require the use of hearing protection until the 1980s, when the first audiograms were performed in 1984, the plaintiffs already had worked through many years of unprotected exposure to noise, which contributed to the hearing loss reported on their audiograms. He was also of the opinion that employees continued to suffer noise induced hearing loss after 1984, because Entergy/Gulf States provided inappropriate hearing protection, did not enforce the use of hearing protection and failed to instruct its employees in the proper use of the hearing protection.

Dr. Lipscomb testified that he employed a cause and effect analysis in reaching his conclusions as to causation, and that the analysis involving four steps: (1) was the worker's exposure sufficient to cause the scope of the hearing impairment; (2) is the hearing test data consistent with the condition; (3) time course; and (4) are the complaints appropriate. He stated that a negative answer to any of these questions rules out noise-induced hearing loss. However, he found them all positive with regard to the plaintiffs in this action.

Dr. Lipscomb began his analysis with the assumption that the plaintiffs' hearing was normal at the start of their career with Entergy/Gulf States. He reached this assumption because when they went to work, they were within the age

---

[10]Sound level surveys of the Nelson Station facility were done on, June 9, 1994; July 25-27, 1995; June 4, 1997; and June 23, 1997.

16

category (18-22 years) that forms the basis for the "zero" hearing impairment line on the audiogram. In 1984, after the first audiograms were performed by Entergy/Gulf States, the plaintiffs' hearing was worse than would otherwise have been expected in someone of their ages.

Dr. Lipscomb also recognized the importance of adequate dosimeter readings in studying the relationship between noise and hearing loss, but agreed with Mr. Bruce that a small sample of dosimeter readings is not representative of noise an individual is exposed to over a career. To the extent it is possible, a dosimeter study is a helpful tool in determining causation, but it is not always necessary.

Dr. Lipscomb testified that he relied on Mr. Bruce's noise summary data in reaching his opinion as it was based on sound measures taken in the regions the plaintiffs worked. For this reason, he stated that he relied on it more than he did on the plaintiffs' testimonies as that revealed little in terms of quantifiable amounts of exposure. However, he admitted that he made no attempt to verify Mr. Bruce's data.

Dr. Roeser testified that he examined Mr. Pharr and Mr. McCarthy for rehabilitation purposes. Although he was not asked to render an opinion as to causation, he stated that there was enough information available, outside of the noise surveys, for him to render such an opinion. After examining the plaintiffs, he opined that based on their thirty-seven years of exposure to noise levels at the Nelson Station facility, Mr. Pharr and Mr. McCarthy's employment was a significant contributing factor to their hearing loss.

Dr. Roeser testified that his opinion was not dependent on the noise levels determined by Mr. Bruce. Rather, he stated that it was based on the fact that noise levels were identified at the Nelson Station facility which resulted in noise surveys

being performed, and the determination from those surveys that the noise levels were above OSHA's requirements for the use of hearing protection.

Mr. Lauderdale testified that he compared the 1995 noise survey performed at the Nelson Station facility with the later surveys and found that the areas having dBA levels of eighty-five or greater had increased. Additionally, his review of a 1989 report from a company monitoring sixty-three workers at the Nelson Station facility (including Mr. Pharr) revealed that of the workers monitored, 58.7% had normal hearing, 7.9% had a mild hearing loss, 22.2% had a moderate hearing loss, 7.9% had a severe hearing loss, and 3.2% had a first shift in their hearing. Mr. Lauderdale stated that as an industrial hygienist, he would interpret this information as showing a high incidence of hearing loss in this group of workers.

Mr. Lauderdale testified that he reviewed the sound level ranges Mr. Bruce used in his analysis and determined that based on the data he had, they were generally within the ranges he would expect to find. He explained that there is no analytical tool available to determine the answers asked in this type of litigation, but that he performed qualitative evaluations and used his own background and experience in evaluating the information available in this matter in reaching his determinations.

Mr. Lauderdale opined that the plaintiffs were exposed to noise levels at the Nelson Station facility, which exposures were of a duration (at least thirty years) to increase their risk of hearing loss as a result of noise. He further opined that Entergy/Gulf States had never satisfied OSHA's hearing conservation program requirements or those required by 29 CFR 1910.95 (1971), although it made an incomplete attempt in the mid-1980s by performing audiometric testing and noise surveys. This attempt, according to Mr. Lauderdale, failed to place sufficient emphasis on the training and education of its workers. That failure prevented the

18

workers from understanding the correlation between the hearing conservation program and their possible medical consequences.

Dr. Seidemann not only disagreed with the conclusions reached by Mr. Bruce and Dr. Lipscomb, but disagreed with Mr. Bruce's discounting of the dosimeter evidence. According to Dr. Seidemann, it was unscientific, unprofessional, and unacceptable to discard valid objective data in order to use conjecture numbers which could not be verified.

Before reaching his conclusion that the plaintiffs' work environment did not cause their hearing losses, Dr. Seidemann interviewed both plaintiffs, reviewed their depositions, performed additional audiograms on the plaintiffs, reviewed Entergy/Gulf States' 1995, 1997, and 2002 noise surveys, and reviewed Entergy/Gulf States' 2006-2009 dosimeter surveys. He concluded that the hearing losses suffered by both plaintiffs were age appropriate, or caused by other sources of noise.

### Action of the Trial Court

In its written reasons, the trial court concluded the plaintiffs proved that the noise levels generated at the Nelson Station facility were sufficient to cause their occupational hearing losses. In considering Mr. Bruce's noise summary, it stated:

> However, it is noteworthy that exhibit P-27 is a compilation prepared by Dr. Bruce in his field of expertise, whose expertise was accepted by the Court and not contested by the defendant. Furthermore, it was a compilation made from direct input of the plaintiffs, thus it was meant to be, not a noise survey of the GSU facility, but a dosimeter-type record relating to each plaintiff. As a result, P-27 is arguably more probative to the noise levels sustained by the plaintiffs at the facility, at least through the first 20 years or so of their employment at GSU and before the use of earplugs was mandated and enforced by GSU.

After reviewing the expert witness testimony, we find no error in the trial court's decision to credit the testimony of Mr. Bruce over that of Dr. Seidemann.

19

In this instance, the trial court was presented with two differing views pertaining to whether the utilization of a dosimeter computation is necessary to relate the plaintiffs' hearing loss to their years of employment at the Nelson Station facility, and the trial court accepted Mr. Bruce's opinion.

Entergy/Gulf States further claims that the noise summary compiled by Mr. Bruce, and relied on by Dr. Lipscomb, is inaccurate as it is not based on the plaintiffs' actual time adjacent to the various noise sources and because it omits all noise levels below 85 decibels. Given the lack of Entergy/Gulf States records prior to 1980, the only way to determine the noise the plaintiffs were exposed to is by estimation. Finally, with regard to Mr. Bruce's omission of all sound levels below 85 decibels, we note that 29 C.F.R. 1910.95 only requires the integration of noise levels between 80 and 130 decibels into the noise measurements required as part of a hearing conservation program. 29 C.F.R. 1910.95(d)(2)(i).

As the trial court's determinations on this issue lies within the trial court's fact-finding province and is supported by the record, we find no error in the trial court's decision to credit the testimony of Mr. Bruce and Dr. Lipscomb over that of Dr. Seidemann. Accordingly, the trial court judgment, finding that Mr. Valerie and Mr. Pharr satisfied their burden of proving that their respective hearing losses resulted from the noise they were exposed to during their employment with Entergy/Gulf States is affirmed.

### CONTRIBUTORY NEGLIGENCE

Entergy/Gulf States next argues that the trial court erred by failing to find that the plaintiffs' contributory negligence barred their recovery of damages in this matter.[11] It argues that because the majority of the alleged tortious damage

_____

[11] Although this issue was raised as an affirmative defense by Entergy/Gulf States, it was not specifically addressed by the trial court in its written reasons and its judgment. Thus, we will

20

suffered by the plaintiffs occurred prior to the demise of contributory negligence in August 1980, contributory negligence applies to bar their recovery. Although it claims generally that both plaintiffs are barred from recovery, it only specifically refers to Mr. Pharr. Nevertheless, we disagree with Entergy/Gulf States' argument as to both plaintiffs.

Contributory negligence is an affirmative defense which must be specifically pled by the defendant. Thus, the defendant also bears the burden of proving by a preponderance of the evidence that "the plaintiff's contributory negligence must be a cause-in-fact and a legal cause of his damages." F. Maraist & T. Galligan, Jr., *Louisiana Tort Law*, § 9-2, at 191 (1996). The determination of whether a plaintiff's recovery is barred by contributory negligence is a finding of fact and, like all other factual findings, is subject to the manifest error standard of review on appeal. *Soileau v. S. Cent. Bell Tel. Co.*, 406 So.2d 182 (La.1981).

In this instance, Entergy/Gulf States places great emphasis on the fact that Mr. Pharr "already understood how loud noise can harm hearing based upon his significant military training and work as a jet aircraft mechanic." Entergy/Gulf States claims that because he knew to wear hearing protection on the flight line while in the military, he had "the knowledge, experience and responsibility to, at minimum, take equivalent steps to protect himself." We reject this argument.

Mr. Pharr testified that he was ordered to wear hearing protection while on the flight line working as a crew chief. There is no evidence that he underwent significant training or education about protecting his hearing. Rather, it is obvious that his significant training involved learning to work on jet engines. Furthermore,

---

treat it as being denied by the trial court. *Hayes v. La. State Penitentiary*, 06-553 (La.App. 1 Cir. 8/15/07), 970 So.2d 547, *writ denied*, 07-2258 (La. 1/25/08), 973 So.2d 758.

21

there is a great difference between being ordered to do something by a superior officer and being educated on a safety issue.

Furthermore, we further find no evidence that the plaintiffs were contributorily negligent through their actions while employed at the Nelson Station facility. Both plaintiffs stated that they were not provided hearing protection until the latter portion of their employment. However, they stated that Entergy/Gulf States never instructed them about why hearing protection was required or in the proper use of the hearing protection. Both plaintiffs admitted knowing that some of the areas around the Nelson Station facility were loud and that at some point, Entergy/Gulf States posted the louder areas. However, both stated that Entergy/Gulf States did not require the use of hearing protection until later in their employment. Both also testified that Entergy/Gulf States never explained that their hearing could be damaged by loud noises. Finally, Mr. Valerie testified that he was unaware that he suffered a hearing problem until undergoing the April 1999 audiogram set up by his attorney.

Dr. Lipscomb, Mr. Bruce, and Mr. Lauderdale all testified that information pertaining to noise management, audiometric testing, and hearing conservation programs were available to industry in the 1950s. Moreover, Dr. Lipscomb testified that Entergy/Gulf States was in the best position to know whether the plaintiffs' hearing problems were work-related. Even Michael Durham, Entergy/Gulf State's Safety Director knew that OSHA recognized noise as a workplace hazard and had provisions pertaining to hearing protection and noise control in 1971.

Accordingly, we find no error in the trial court's conclusion that the plaintiffs were not contributorily negligent.

## *DAMAGES*

In its next assignment of error, Entergy/Gulf States argues that the trial court erred in awarding damages to Mr. Valerie because, by his own testimony, he suffered no damages.

"General damages are those which are inherently speculative in nature and cannot be fixed with mathematical certainty." *Miller v. LAMMICO*, 07-1352, p. 27 (La. 1/16/08), 973 So.2d 693, 711. General damages can include an award for mental or physical pain and suffering and loss of enjoyment of life. *Id.*

> An appellate court reviews a trial court's general damage award using the abuse of discretion standard. *Coco v. Winston Industries, Inc.*, 341 So.2d 332, 335 (La.1976). The trier of fact is afforded much discretion in independently assessing the facts and rendering an award because it is in the best position to evaluate witness credibility and see the evidence firsthand. *Anderson v. New Orleans Pub. Serv., Inc.*, 583 So.2d 829, 834 (La.1991). An appellate court may disturb a damages award only after an articulated analysis of the facts discloses an abuse of discretion. *Theriot v. Allstate Ins. Co.*, 625 So.2d 1337, 1340 (La.1993); *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1261 (La.1993) (the fact finder's discretion in awarding general damages is vast and should rarely be disturbed); *Reck v. Stevens*, 373 So.2d 498, 501 (La.1979). To determine whether there has been an abuse of discretion by the fact finder, the reviewing court looks first to the facts and circumstances of the particular case. *Theriot*, 625 So.2d at 1340; *Reck*, 373 So.2d at 501. Only if a review of the facts reveals an abuse of discretion, is it appropriate for the appellate court to resort to a review of prior similar awards. *Reck*, 373 So.2d at 501; *Anderson*, 583 So.2d at 834; *Youn*, 623 So.2d at 1261. In a review of the facts, the test is whether the present award is greatly disproportionate to the mass of past awards for truly similar injuries. *Theriot*, 625 So.2d at 1340; *Reck*, 373 So.2d at 501. It is important to note, however, that prior awards are only a guide. *Theriot*, 625 So.2d at 1340.

*Id.* at 711.

Mr. Valerie did not testify that he suffered no hearing loss. He testified that he was not aware that he suffered a hearing loss until he underwent an audiogram in April 1999. However, both his wife and his daughter testified that they noticed Mr. Valerie's difficulties long before the April 1999 audiogram simply confirmed the preexisting condition.

23

Dr. Roeser testified that it is common for a person suffering a hearing loss to deny that they suffer such a loss, and both Dr. Roeser and Dr. Lipscomb testified that the presence of pain was not necessary to a noise induced hearing loss. Furthermore, Dr. Lipscomb testified that often a person is unable to perceive that he is suffering a hearing loss because it is a gradual process and may not be noticed unless something alerts the person.

After reviewing the record, we find no error in the trial court's award of general damages to Mr. Valerie. Based on these findings and the trial court's much discretion in awarding damages, we find no abuse of discretion in the trial court award of $50,000.00 in general damages to Mr. Valerie.

### WORKERS' COMPENSATION

Entergy/Gulf States next argues that the trial court erred in not finding that the claims of the plaintiffs arising prior to July 1, 1983, are barred by the former provisions of the Louisiana Workers' Compensation Act.

Prior to the 1983 revision of the Louisiana Workers' Compensation Act, Louisiana Revised Statutes 23:1221(4)(p) provided, "In cases not falling within any of the provisions already made . . . where the usefulness of a physical function is seriously permanently impaired, the court may allow such compensation as is reasonable[.]" An "accident," circa 1982, was defined as "an unexpected or unforeseen event happening suddenly or violently, with or without human fault and producing at the time objective symptoms of an injury." La.R.S. 23:1021(1). Subsequent to the 1985 revision, La.R.S. 23:1221(4)(p) provided:

> In cases not failing within any of the provisions already made, where the employee is seriously and permanently disfigured or suffers a permanent hearing loss solely due to a single traumatic accident . . . compensation not to exceed sixty-six and two-thirds percent of wages for a period not to exceed one hundred weeks may be awarded.

The definition of an "accident" was revised in 1983 to mean "an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration." La.R.S. 23:1021(1).

Entergy/Gulf States argues that Louisiana courts have always interpreted the Workers' Compensation Act liberally in favor of finding coverage under its provisions. Relying on this judicial truism and supporting jurisprudence, it claims that the plaintiffs' occupational hearing loss is compensable only in workers' compensation.

In support of this claim, Entergy/Gulf States relies primarily on *Ferguson v. HDE, Inc.*, 270 So.2d 867 (La.1972), and *McCoy v. Kroger Co.*, 431 So.2d 824 (La.App. 2 Cir. 1983), for the proposition that "an 'accident' has occurred for the purposes of the statute where 'the conditions of the employment provide continual strain or trauma' which over time injure the employee, 'even though each individual event in itself is very minor in character.'" (Footnote omitted.)

This issue was addressed exhaustively by the fourth circuit in the recent case, *Becker v. Murphy Oil Corp.*, 10-1519, pp. 35-38 (La.App. 4 Cir. 6/2/11), 70 So.3d 885, 908-10 (footnotes omitted):

> Murphy relies upon several cases, none of which involve hearing loss, to support the theory that previous versions of the LWCA covered gradual hearing loss due to occupational noise exposure: *Ferguson v. HDE, Inc.*, 270 So.2d 867 (La.1983) (stroke compensable under LWCA because it happened "suddenly and violently"); *Parks v. Insurance Company of North America*, 340 So.2d 276 (La.1976)(bronchitis compensable under the LWCA because the illness "was unexpected and unforeseen and occurred suddenly producing at the time objective symptoms"); *Hale v. Pinecrest State School*, 505 So.2d 987 (La.App. 3d Cir.1987)(ruptured disc compensable when caused by single work-related accident on a specific date); *McCoy v. Kroger Co.*, 431 So.2d 824 (La.App. 2 Cir.1983)(aggravation of a degenerative foot condition compensable);

25

*Gotte v. Cities Service Oil Co.*, 298 So.2d 920 (La.App. 3d Cir.1974)(pneumonia caused by exposure to extreme temperature variations on or about October 29, 1969 was compensable).

Murphy's reliance on *Chatelain v. American Can Co.*, 344 So.2d 1180 (La.App. 4th Cir.1977)[,] is misplaced. The employee in *Chatelain* brought suit seeking workers' compensation benefits and total disability, arguing that his partial hearing loss was caused by his employer. The court ultimately held that the employee did not demonstrate that it was more likely than not that an "industrial accident" occurred; nor did the employee prove that it was causally related to his disability. Contrary to Murphy's assertion, we do not find the court's remark that "extraordinary physical stress and strain is not essential to the definition of disabling accident" stands for the proposition that Louisiana courts have determined that gradual hearing loss caused by occupational noise exposure is compensable under the LWCA.

Murphy concedes that *Comoletti v. Ideal Cement Co.*, 147 So.2d 711 (La.App. 1st Cir.1962)[,] held that under the pre-1983 version of the LWCA, hearing loss caused by gradual or chronic noise exposure was not a personal injury by accident, noting that "[i]f the disability comes on gradually, it is not an accident but an occupational disease." *Comoletti*, 147 So.2d at 717 (quoting *Valentine v. Godchaux Sugars, Inc.*, 90 So.2d 442 (La.App.Orl.1956); *Mauchline v. State Ins. Fund*, 279 Pa. 524, 124 A. 168 (1924)). *Comoletti* involved a laborer who was injured while "shooting kilns" for his employer, Ideal Cement Company. The First Circuit ultimately held that the injury was compensable under the LWCA because it was "most unlikely" that the employee's hearing loss "resulted from gradual and protracted exposure to noise but rather it was occasioned suddenly and unexpectedly as a result of his exposure to noise of excessive and unusual intensity on a specific date, namely, July 28, 1960." *Comoletti*, 147 So.2d at 719 (emphasis added). Thus, the court held that the employee's hearing loss "resulted from an 'accident' within the meaning of the term as employed in our workmen's compensation statute." *Id*.

Murphy cites no case wherein an employee was granted worker' compensation benefits for gradual hearing loss due to occupational noise exposure, nor does Murphy cite a case which holds that gradual hearing loss is a compensable "accident" under the LWCA. Considering the foregoing, we conclude that gradual hearing loss resulting from occupational noise exposure over a period of many years simply cannot meet the definition of an "accident" under any version of the LWCA. Likewise, the trial court did not err in finding that Mr. Barcia's claims are not a basis for recovery under the LWCA as an occupational disease.

26

We agree with the fourth circuit that the plaintiffs' gradual hearing loss, over the many years of their employment with Entergy/Gulf States, does not satisfy the definition of an "accident" under either version of La.R.S. 23:1021(1). Absent such a finding, the plaintiffs are precluded from availing themselves of the benefits provided by the Louisiana Workers' Compensation Act.

We find no error in the trial court conclusion rejecting Entergy/Gulf States' claim that the Louisiana Workers' Compensation Act precludes the plaintiffs' tort claims.

## *COSTS*

Finally, Entergy/Gulf States asks that the award of costs to the plaintiffs be reversed if this court reverses, in whole or in part, judgment in favor of plaintiffs. Based on our findings affirming the trial court's judgment in favor of the plaintiffs, this issue is rendered moot and will not be addressed.

## DISPOSITION

Based on the foregoing findings, we affirm the trial court judgment in all respects. We assess all costs to the defendant, Entergy Gulf States, Inc.

**AFFIRMED.**

27